IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver of The Columbian Bank and Trust Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 11-CV-2447 JAR/KGS |
| CARL L. McCAFFREE, JIMMY D. HELVEY and SAM McCAFFREE, | ) ) ) ) | |
| Defendants. | ) ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver of The

Columbian Bank and Trust Company ("FDIC-R"), for its First Amended Complaint

against Defendants Carl L. McCaffree, Jimmy D. Helvey and Sam McCaffree, states as

follows:

**INTRODUCTION**

1.      The FDIC-R brings this case in its capacity as Receiver of The Columbian

Bank and Trust Company ("Columbian" or the "Bank"), pursuant to authority granted by

12 U.S.C. § 1821.  The FDIC-R seeks to recover losses of at least $56 million the Bank

suffered because Defendants – three of its former directors and executive officers

(collectively, "Defendants") – negligently, grossly negligently, and in breach of their

fiduciary duties originated and/or approved poorly underwritten large commercial and

commercial real estate ("CRE") loans from November 2004 through May 2008 and failed

to properly supervise the Bank's lending function.  The actions and omissions that give

rise to the Defendants' liability include, among other things, failing to heed warnings of

bank supervisory authorities; extending credit in violation of the Bank's own written loan

policies; permitting conflicts of interest to the detriment of the Bank; providing financing

for speculative ventures in which the borrowers invested little or no money of their own;

extending credit to borrowers who were not creditworthy or were known to be in

financial difficulty; extending credit based on inadequate information about the financial

condition of prospective borrowers and without adequately analyzing cash flow, debt

service coverage and other critical financial information; extending "short-term" loans

without binding take out commitments; permitting unsafe and unsound concentrations of

credit; permitting the improper use of interest reserves and capitalization of interest; and

failing to supervise, manage, conduct, and direct the business and affairs of the Bank to

insure compliance with the by-laws of the Bank, and safe, prudent principles of banking.

## THE PARTIES

### Plaintiff

2.     Plaintiff, the FDIC-R, was appointed as Receiver of Columbian on August

22, 2008, by the *Office of the State Bank Commissioner of Kansas* ("OSBC"). Pursuant

to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all rights, titles, powers, and

privileges of Columbian, Columbian's shareholders, accountholders, and depositors,

including, but not limited to, Columbian's claims against the Bank's former directors and

officers as set forth herein.

### Defendants

3.     Carl L. McCaffree ("McCaffree") was Columbian's Vice President, Board

Secretary, and a member of its Board of Directors from 1974 until the Bank failed.  By at

least March 2001, McCaffree owned a controlling interest in the Bank's holding company stock and ultimately McCaffree owned 100% of the holding company's stock; McCaffree thus effectively owned the Bank. He was also a member of the Directors' Loan, Audit, Risk Assessment and Compensation Committees. He resides in Leawood, Kansas.

4.    Jimmy D. Helvey ("Helvey") became President and Chief Executive Officer ("CEO") of Columbian in 1996, as well as a member of its Board of Directors and Directors' Loan Committee. Helvey was the principal commercial loan officer at Columbian, and originated many of the loans mentioned herein. Helvey resigned his positions as an officer and director of the Bank in July 2008. He resides in Overland Park, Kansas.

5.    Sam McCaffree ("Sam McCaffree") purchased Columbian in 1962 and became Chairman of the Board of Directors. Sam McCaffree was also a member of the Directors' Loan Committee. He remained Chairman of the Board and a member of the Directors' Loan Committee until the Bank was closed on August 22, 2008. He resides in Overland Park, Kansas.

6.    The Defendants, and other culpable former Directors, constituted a majority of the Board of Directors, and controlled Columbia until it was closed on August 22, 2008.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction of this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, et seq.; 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.

8.      The Court has personal jurisdiction over Defendants who at all relevant times were residents of, and conducted the business of Columbian in, the State of Kansas.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

10.     Columbian, formerly known as The Columbian Trust Company, was established and insured by the FDIC on October 2, 1978.  On December 1, 1996, it was renamed The Columbian Bank and Trust Company and its primary federal regulator changed from the Office of the Comptroller of the Currency to the FDIC.  The Bank's state regulator was the OSBC.  Columbian was headquartered in Topeka, Kansas, and at closing, it had seven branches in Kansas and one in Missouri.

11.     Columbian was wholly owned by a two-bank holding company, Columbian Financial Corporation ("CFC"), which in turn ultimately was wholly owned by McCaffree.

12.     In 2003, at McCaffree's direction, Columbian initiated an aggressive commercial and CRE lending program devised to drive up the Bank's revenues.  The uncontrolled lending incident to this program caused the collapse of this 40-year old bank in just five years.  As an incentive to the Bank's loan officers to generate these increased earnings, McCaffree instituted a program to award employees annual "performance" bonuses based on factors that encouraged loan production, but not loan quality.  On top of this, McCaffree awarded extra bonuses to other officers at his discretion, which further incentivized loan production without loan quality.

13      During the years 2003-2006, the Bank's regulators - *i.e.* the FDIC and OSBC - identified the increasingly risky behavior of Bank management and warned the

Bank's officers and directors of serious deficiencies in the Bank's lending practices.  In 2003, the regulators warned Bank management that its loan policies were inadequate and that the loan portfolio contained substantial inherent risks as a result of the Bank's 80% concentration in commercial and CRE loans.  At the next examination in 2005, the regulators warned Bank management that the institution's risk profile had increased due to rapid loan growth in brokered and out-of-territory loans and that the Bank's loan reviews were insufficient considering the complexity of its lending.  Moreover, the regulators admonished the directors and officers that the Bank's staffing was insufficient to fully document and analyze borrower financial information.

14.     In 2007, the regulators once again cautioned Columbian's directors and officers that "[s]ervicing out-of-territory loans lends itself to an increased risk characteristic, led by management's lack of familiarity with regional conditions and reliance on third-parties to ensure compliance."  Thirty-two percent of Columbian's loans were brokered, and all of these were out-of-territory.  The regulators warned that, "[e]conomic conditions have driven more marginal borrowers to utilize these brokerage services to obtain financing."

15.     The following chart summarizes some of the regulatory warnings that were provided to the Bank's officers and directors prior to the Bank's failure in 2008:

|  | FDIC Exam | State Exam | FDIC Exam | Joint Exam | FDIC Exam |
|---|---|---|---|---|---|
| **As of Date** | 6/30/03 | 3/31/05 | 3/31/06 | 3/31/07 | 12/31/07 |
| **Date Exam Sent to or Executed by Board of Directors** | 11/12/03 | 7/13/05 | 7/12/06 | 12/10/07 | 04/30/08 |
| **Composite CAMELS Rating** | 2 | 1 | 2 | 3 | 4 |
| **Regulatory Criticisms** |  |  |  |  |  |
| Ineffective Oversight | X |  | X | X | X |
| Weak Loan Underwriting | X | X | X | X | X |
| Concentrations of Credit | X |  | X | X | X |
| Out-of-Territory Lending | X |  | X | X | X |
| Disregard of Prior Criticism |  |  | X | X | X |
| Improper Interest Reserves |  |  | X |  | X |
| Classified Loans | X |  | X | X | X |
| Criticism of Loan Policy | X | X | X | X | X |

## Columbian's Loan Policies

16.    The loan policies relevant to the FDIC's claims were first adopted by Columbian's Board of Directors on October 1, 2001; a revised version of the policy was adopted by the Board of Directors on March 6, 2006.  The 2001 policy provided that the Board "is ultimately responsible for all lending activities"; the 2006 policy provided that the Board "is responsible for the general supervision of all bank affairs, including the loan portfolio."  Both policies provided that all loans "shall be consistent with sound and prudent bank practices and in full compliance with applicable laws [and] regulations."  Both policies required Board approval for all loans in excess of $1 million.  All the loans at issue in this case were over $1 million and were approved by the defendants as members of the Directors Loan Committee and Board of Directors.

17.    Columbian's loan policies classified the following types of loans as "undesirable":  loans without at least two clear sources of repayment; loans for speculative purposes; loans secured by stock that is not readily marketable; loans outside the trade territory of the bank "unless the loan is advantageous and financially feasible to

the bank"; and loans secured by unimproved land, unless supported by an acceptable

takeout commitment or acceptable repayment plans supported by adequate cash flow.

The loan policies also stated that interest capitalization "is generally a strong indication

of the lack of ability to service a debt" and that "capitalization of interest is generally not

allowed."

     18.    As discussed below, Defendants approved numerous "undesirable" loans

in violation of these and other provisions of the Bank's loan policies.

<strong><u>THE LOSS LOANS</u></strong>

     19.    Between December 2004 and May 2008, the Board of Directors approved

numerous poorly underwritten loans that violated the Bank's loan policies as well as

sound and prudent banking practice.  The following loans and their associated losses,

which are summarized in the chart below, are examples of some of these negligently

underwritten loans

| Borrower | Date of Loan | Board Approval | Amount | Loss |
|---|---|---|---|---|
| 11500, LLC | 12/21/04 | 11/10/04 | $7,000,000 | |
| | 10/07/05 | 09/14/05 | $6,115,785 | |
| | 07/07/06 | 07/05/06 | $2,900,000 | |
| | 11/26/06 | 11/22/06 | $1,584,215 | |
| | 11/27/07 | 12/05/07 | $17,600,000 (Consolidation of prior 4 loans) | |
| | 03/10/08 | 01/23/08 | $18,000,000 (Restructuring of consolidation loan) | $7,866,850 |
| Brooke Capital Corporation | 12/15/06 | 12/15/06 | $8,500,000 | $5,501,858 |
| Northern Capital, Inc. | 12/29/06 | 12/27/06 | $5,000,000 | |
| | 09/27/07 | 09/19/07 | $5,000,000 | $6,242,221 |
| Security First Holdings, LLC | 05/11/07 | 05/09/07 | $9,230,000 | |
| | 01/31/08 | 01/30/08 | $2,000,000 | $7,726,808 |
| American Integrity Insurance Group, LLC | 09/27/07 | 09/19/07 | $5,000,000 | $1,480,544 |
| Brooke Credit Corporation | 05/29/08 | 05/28/08 | $4,600,000 | $3,256,088 |

| Borrower | Date of Loan | Board Approval | Amount | Loss |
|---|---|---|---|---|
| JAM Land, LLC | 11/10/05 | 10/26/05 | $2,600,000 | |
| All American Plazas, Inc. | 01/09/06 | 12/28/05 | $3,500,000 | |
| All American Plazas, Inc. | 02/01/06 | 02/01/06 | $6,500,000 | |
| Keystone Capital Group, Inc. | 02/22/07 | 02/14/07 | $15,000,000 (consolidation loan) | $9,132,594 |
| Lockhaven Estates, LLC | 04/27/06 | 03/15/06 | $1,800,000 | |
| Anasazi Downtown, LLC and Copper Square Condominium, LLC | 08/04/06 | 07/26/06 | $11,000,000 | |
| | 10/30/07 | 10/24/07 | $16,000,000 (Renewal and increase in loan) | $15,430,533 |
| TOTAL | | | | $56,637,497 |

### A.   Out-Of-Territory And Insurance Industry Concentration Loans To Brooke Capital Corporation and Brooke Credit Corporation

20.   Brooke Capital Corporation ("Brooke Capital") and Brooke Credit Corporation ("Brooke Credit") are subsidiaries of Brooke Corporation ("Brooke Corp.").

21.   Brooke Corp. and Brooke Capital are now in Chapter 7 Bankruptcy, and Brooke Credit is no longer in business.

22.   Prior to its bankruptcy, Brooke Capital sold insurance franchises to existing or newly-formed insurance agencies.  Brooke Credit would lend the franchisees, many of which were not creditworthy, the entire amount they needed to purchase the franchises.  The franchisees would then use the proceeds of the loan to pay fees to Brooke Capital.  Brooke Credit sold participations in several of these loans to Columbian. Under its participation agreements, Brooke Credit, as the lead lender and originator of the loan, assumed responsibility for collecting payments under the loan and agreed to remit to Columbian its pro rata share of the interest and principal payments on the loans.

23.   The business model of the Brooke entities depended almost entirely on the initial fees that Brooke Capital received from its franchisees.  These fees, in turn, depended upon the franchisees obtaining 100% financing from Brooke Credit.  This

business model put tremendous pressure on Brooke to enroll new franchisees (in order to generate initial fees) and for Brooke Credit to finance new franchisees and to sell participations in those loans to lenders such as Columbian.

24.     In its 2005 Form 10-K Annual Report with the Securities and Exchange Commission ("SEC"), Brooke Corp. described this flaw in its business model and disclosed that it had an incentive "to extend credit to borrowers that may not meet stringent underwriting guidelines":

> *Our dependence on initial fees creates an incentive for us to extend credit to borrowers that may not meet stringent underwriting guidelines.*
>
> A significant part of our revenues are derived from one time initial fees we receive from assisting franchisees and others with the acquisition of businesses.  Generating fees is largely dependent on our franchisees' and others' ability to obtain acquisition financing from Brooke Credit.  Our dependence on these initial fees creates an incentive for us to extend credit to borrowers that may not meet stringent underwriting criteria.  Our failure to follow stringent underwriting guidelines could adversely affect the quality of the loans we make and adversely affect our financial condition and results of operations.
>
> (Emphasis in original.)

The same warnings were set forth in Brooke Corp's 2006 10-K and 10-K/A and 2007 10-K.

25.     As described below, despite this and other warnings, beginning in December 2006, the Defendants made a series of loans to Brooke Capital and Brooke Credit, and purchased loan participations from Brooke Credit, which ultimately led to losses exceeding $23 million.

## 1.     Columbian's Loans To Brooke Capital

26.     On December 15, 2006, defendants Helvey and McCaffree approved an

$8.5 million loan to Brooke Capital. Columbian's "Loan Approval Request" form

("LAR"), which was submitted to the Board of Directors, stated that the loan was to be a

"short term" loan "to assist [Brooke Capital] with year end tax management issues." The

collateral for the loan was Brooke Capital's accounts receivable.

27.     Defendants Helvey and McCaffree approved the $8.5 million loan even

though the LAR provided to them noted that Brooke Capital's "profits are down for the

three quarters ending September 30, 2006, due to increase[d] write offs of franchise

accounts receivable" and that its net income had been declining since December 2004.

The LAR did not contain a cash flow or debt service coverage ("DSC") analysis, and

lacked a listing and aging of the accounts receivable pledged as collateral.

28.     No principal or interest was ever paid on this $8.5 million "short-term"

loan. Instead, the defendants approved four renewals of the loan. At each renewal, the

defendants permitted the capitalization of interest, approved the loan without a listing and

aging of accounts receivable, and approved the loan despite the fact that no cash flow or

DSC analysis was performed. The loan package provided to the defendants demonstrated

that the loan was improperly underwritten and failed to meet Columbian's loan policies.

Defendants willfully ignored these deficiencies and approved the loan despite substantial

known risks and or risks that should have been known in the exercise of due diligence.

29.     The loss on this loan was at least $5,501,858.

2.     **Participations Purchased From Brooke Credit**

a.     **Northern Capital, Inc. Participations.**

30.     Northern Capital, Inc. was a Florida insurance holding company that owned 100% of Northern Capital Insurance Company ("Northern Capital Insurance") and Northern Capital Management, Inc. ("Northern Capital Management"), a managing general agency.  On December 28, 2006, Brooke Credit loaned Northern Capital, Inc. $10,722,646 for a ten-year term.  The collateral was 100% of the common stock of Northern Capital Insurance and all the assets and common stock of Northern Capital Management.  Only $7,000,000 of the loan proceeds went to Northern Capital.  The remaining $3,722,646 went to Brooke Credit to repay a prior loan and for fees.

31.     On December 27, 2006 (the day before Brooke Credit made the loan), defendants Helvey, McCaffree and Sam McCaffree approved the purchase of a $5 million (47%) participation in the loan.

32.     The LAR provided to Helvey, McCaffree and Sam McCaffree did not contain a cash flow or DSC analysis, or consolidated financial statements for the borrower and its related entities.  The LAR noted that Northern Capital Insurance was a new insurance company and had written its first policy in September 2006 – only three months before defendants approved Columbian's purchase of the participation in the Northern Capital loan.

33.     Brooke Credit's credit memorandum and a November 2006 financial statement from Northern Capital and Northern Capital Management revealed that the two corporations were insolvent and had a negative net income of $548,887.  Further, Northern Capital's principal asset, Northern Capital Insurance Company, had negative

net income of $1,892,900.  The Brooke Credit credit memorandum also noted that

although the shares of Northern Capital Insurance Company were pledged as collateral

for the loan, "the assets owned by Northern Capital Insurance Company cannot be

directly pledged to [Brooke Credit] as these assets are held for the benefit of insured's

[sic] of the insurance company."  The memorandum also disclosed that the individual

guarantors for the loans had combined cash of only $97,000 and the rest of their assets

were illiquid.

34.     On September 14, 2007, Brooke Credit made another loan to Northern

Capital, this time for $7,931,000.  The stated purpose of the loan was to inject equity

capital into Landmark One Insurance Company, a Florida insurance company

incorporated by the guarantors on October 12, 2007 -- one month *after* Brooke Credit

made the loan.  Only $7 million of the loan proceeds were disbursed to Landmark One

Insurance Company; the remaining $931,000 was paid to Brooke Credit and its related

interest, Brooke Capital Advisors, Inc., "for consulting."

35.     On September 19, 2007, Helvey, McCaffree and Sam McCaffree approved

the purchase of a $5 million participation in the loan.  These defendants approved the

loan participation without reviewing a new LAR or any cash flow or DSC analysis.  The

personal financial statements on some of the guarantors were outdated; none of the

guarantors had liquid assets.

36.     Northern Capital Insurance is in receivership.  The resulting loss on this

participation loan was at least $6,242,221.

**b.      Security First Holdings, LLC Participations.**

37.     Security First Insurance Holdings, LLC ("Security First Insurance Holdings") is a Florida insurance holding company which owns 100% of Security First Insurance Company and Security First Managers, LLC ("Security First Managers"), a managing general agency.

38.     On May 11, 2007, Brooke Credit extended an $11,230,000 ten-year loan to Security First Insurance Holdings.  Two days earlier, on May 9, 2007, defendants Helvey, McCaffree and Sam McCaffree approved Columbian's purchase of a $9,230,000 (82%) participation in the loan. Collateral was 100% of the common stock of Security First Insurance Company and all the assets and membership units of Security First Managers.  There were no guarantors.

39.     The LAR provided to Helvey, McCaffree and Sam McCaffree relied on a Credit Memorandum prepared by Brooke Credit, which was attached to the LAR.  The Credit Memorandum provided that only $7 million (62%) of the $11,230,000 loan was to be injected into Security First Insurance Company.  Of the remaining $4,230,000, $3 million was to be paid to existing creditors of Security First Insurance Holdings, and $1,230,000 in fees were to be paid to Brooke Credit and DB Indemnity, Ltd., a related entity that was headquartered in Bermuda.

40.     Although collateral included all assets of Security First Insurance Holdings, this *excluded* all revenue and net income of Royal Palm Insurance Company, a subsidiary of Security First Insurance Holdings which represented 65% of its total revenue and net income.  Further, the assets of Security First Insurance Company were pledged to policyholder obligations.  As a result, the loan was effectively unsecured.

41.     The LAR provided to the defendants showed Security First Insurance

Holdings had a negative net worth of $219,748, a net loss of $914,779 in 2005 and only

$81,092 in net income in 2006.

42.     On December 31, 2007, Brooke Credit made a second loan to Security

First Insurance Holdings.  This loan, in the amount of $14,729,000, was secured by the

common stock of Security First Insurance Holdings and all assets and membership units

of Security First Managers.  There were no guarantors.  On January 30, 2008, Defendants

Helvey, McCaffree and Sam McCaffree approved the purchase of a $2 million

participation in the loan.

43.     The LAR provided to defendants did not contain a cash flow or DSC

analysis prepared by anyone at the Bank, or a consolidated financial statement for

Security First Insurance Holdings and its related entities.  The LAR noted, "Our initial

loan which now carries a balance of just over $9 million and this new loan will be retired

as part of the $150 + million securitization planned in late February or early March of

2008."  The securitization did not occur, however, and Columbian's loan participations

were not "retired."  The loan package provided to the defendants demonstrated that the

loan was improperly underwritten and failed to meet Columbian's loan policies.

Defendants willfully ignored these deficiencies and approved the loan despite substantial

known risks and or risks that should have been known in the exercise of due diligence.

44.     The loss on this loan was at least $7,726,808.

### c.     American Integrity Insurance Group, LLC Participation.

45.     American Integrity Insurance Group, LLC ("American Integrity Insurance

Group"), a Texas limited liability company, owns 100% of American Integrity Insurance

Company of Florida ("American Integrity Insurance Company") and American Integrity

MGA, LLC ("American Integrity MGA"), a managing general agency.

46.    On August 17, 2007, Brooke Credit loaned American Integrity Insurance

Group $11,330,000.  Although the loan was secured by 100% of the common stock of

American Integrity Insurance Company and all the assets and membership units of

American Integrity MGA, the Brooke Credit credit memorandum disclosed that "the

assets owned by American Integrity Insurance Company cannot be directly pledged to

Brooke Credit as these assets are held for the benefit of insured's [sic] of the insurance

company."  As a result, the loan was effectively unsecured.

47.    On September 19, 2007, defendants Helvey, McCaffree and Sam

McCaffree approved Columbian's purchase of a ten-year $5 million participation (44%)

in the loan.  The source of repayment was "cash flow" and a Brooke Indemnity Bond

written by DB Indemnity, Ltd., a Bermuda insurance company owned by Brooke Credit's

parent, Brooke Corporation.

48.    The Brooke Credit credit memorandum indicated that only $500,000 of

the $11,330,000 loan - about 4% - was going to the borrower, American Integrity

Insurance Group.  Specifically, $7.5 million would be used to "repay" the original

investor; $2 million would fund a dividend to shareholders to be used to pay taxes

accrued as the result of income at American Integrity Insurance Group; $1 million would

be used to purchase a "Borrower's Assistance Plan" from another Brooke entity, Brooke

Capital Advisors, Inc.; and $330,000 would pay loan, origination and other transaction

fees, and purchase a "Financial Guaranty Policy" from DB Indemnity, Ltd. for the benefit

of Brooke Credit.

49.     Columbian's LAR did not contain a cash flow, DSC analysis, or a consolidated financial statement for the borrower and its related entities. Instead, defendants Helvey, McCaffree and Sam McCaffree approved Columbian's purchase of the loan participation based on a credit memorandum prepared by Brooke. The Brooke Credit credit memorandum used information from a June 30, 2007, consolidated financial statement from American Integrity Insurance Group. Although the statement showed a net worth of $16.9 million, including the assets of American Integrity Insurance Company, it disclosed that the shareholders of American Integrity Insurance Group intended to distribute $10 million of the net worth to repay "shareholder investment" and income taxes, thus reducing net worth to $6.9 million. Even more disturbing, this $11,330,000 loan (in which Columbian had a $5 million participation) increased American Integrity Insurance Group's liabilities by $10,830,000, thus resulting in a negative net worth of $3,930,000.

50.     The loss resulting from this participation was at least $1,480,544.

### 3.     Participation Purchased In Loan To Brooke Credit

51.     As discussed above, in 2006 and 2007 Columbian made and renewed an imprudent $8.5 million loan to Brooke Capital and purchased $26,230,000 in participations in poor quality loans originated by Brooke Credit. During this period, Columbian also acquired 27 "start-up franchise loans" from Brooke Credit which totaled approximately $4.6 million. Brooke Credit originated these loans to finance franchisees' purchases of "start-up" insurance franchises from Brooke Capital. By 2008, all the "start-up" loans purchased by Columbian were nonperforming. All together, by early

2008, Columbian had advanced over $39 million to Brooke Capital, Brooke Credit and
related entities.

52.    On March 7, 2008, First State Bank of Gothenburg, a $300 million bank in
Gothenburg, Nebraska, population 3,600, loaned Brooke Credit $52.5 million to pay
other creditors.  Despite Columbian's borrower (Brooke-related entities) and industry
(insurance) concentrations, on May 28, 2008, Defendants Helvey, McCaffree and Sam
McCaffree approved Columbian's purchase of a $4.6 million (9.88%) participation in this
loan.

53.    The LAR provided to McCaffree, Helvey and Sam McCaffree stated that
$3.6 million of the $4.6 million participation would be used by Brooke Credit to "pay off
the failed franchise loans" referred to in paragraph 57, above, held by Columbian.  The
remaining $1 million would be used to provide Brooke Credit "with additional liquidity."
Attached to Columbian's LAR, however, was a "Confidential Financing Memorandum"
from Brooke Credit dated January 9, 2009, which is specifically mentioned in
Columbian's LAR.  The first page of this memorandum clearly states that the $52.5
million loan from First State Bank "will be used to retire long-term debt with various
lenders at generally more favorable financing terms."  Specifically, $46 million would be
used by Brooke Credit to retire a loan from "Falcon Mezzanine Partners" and "JZ Equity
Partners," including a $1 million prepayment penalty fee, and "$6.5 million of loan
proceeds will be used to retire a loan with Home Federal Savings & Loan Association of
Lexington, Nebraska."  Thus, there was a complete disconnect between what Columbian
stated its participation would be used for (to pay off failed start-up franchise loans that

Columbian had purchased from Brooke Credit) and what Brooke Credit stated the loan proceeds would be used for (to pay off other creditors of Brooke).

54.   The resulting loss on this participation was at least $3,256,088.

55.   Defendants Helvey, McCaffree and Sam McCaffree knew, or in the exercise of due diligence should have known, that their approvals of these loans were improper, imprudent, and harmful to Columbian.  Among other things, the Brooke loans and participations violated Columbian's loan policy in numerous respects:

- The loan terms included capitalization of interest.

- No current, signed financial statements and credit information were obtained prior to approval.

- Little or no independent underwriting was performed in connection with the out-of-territory borrower loans.

- The start-up businesses received loans with less than 12 months history.

- No visits to the borrowers' premises or verification of the existence and value of the collateral were made.

- Columbian purchased loan participations without the defendants obtaining an understanding of the purpose of the loans or the repayment plans.

56.   In addition to violating Columbian's own loan policy, the defendants' approvals of these loans and participations were grossly negligent because they:

- Approved loans without adequate collateral and guarantors.

- Permitted conflicts of interest among the various Brooke entities.

- Approved the purchase of participations used to pay the demands of other creditors.

- Approved loans to corporations that had declining income and profits.

- Failed to establish repayment programs.

- Extended credit to start-up businesses outside the normal trade area of the bank without analyzing the accuracy or feasibility of financial projections presented by the loan broker.

- Imprudently increased Columbian's industry (insurance) concentration and a borrower (Brooke-related entities) concentration.

- Disregarded the FDIC's admonition in November 2007 to shrink the size of the bank.

**B.    Speculative Loans to 11500, LLC**

57.     Beginning in December 2004, Columbian made a series of imprudent and unwarranted loans to a newly-formed Missouri Limited Liability Company -- 11500, LLC -- to purchase and rehab a commercial office building in Kansas City, which had no signed leases or tenants.  The building, the former headquarters of the defunct Trans World Airlines, had been vacant for years.

58.     Columbian's first loan to 11500, LLC -- $7 million to purchase the building and 70 acres -- was approved by defendants Helvey, McCaffree and Sam McCaffree on November 10, 2004.  The loan, which was a 24-month, interest-only loan, included an interest reserve.  Although the loan was personally guaranteed by members of the borrowing entity, 11500, LLC, Helvey waived credit reports on the individual guarantors.  Helvey noted in a memo in the loan file, "[w]e have not required credit reports on the individual Guarantors.  The strength of the loan is based on the collateral of the building, rather than the Guarantors."

59.     The borrower estimated that the project would require $8.4 million, but would only contribute $1,150,000 of its own funds, which it used to pay contracting companies owned by the individual guarantors.  Despite the $8.4 million estimate, Columbian's loans on the project eventually exceeded $18 million.

60.     Columbian's loan file contained no DSC or cash flow analysis, and no financial statements on this new limited liability company or its guarantors. And although the LAR, prepared by Helvey and provided to McCaffree, Helvey and Sam McCaffree, identified "lease income" as the primary source of repayment, no leases were signed as of the date of closing.

61.     This $7 million loan was never repaid. Instead, over the next two years, the defendants approved three more loans to 11500, LLC, totaling $10.6 million, for purposes of renovating the building. The second loan, in the amount of $6.1 million, was approved on September 14, 2005 by defendants Helvey, McCaffree and Sam McCaffree. The third loan, for $2.9 million, was approved on July 5, 2006 by defendants Helvey, McCaffree and Sam McCaffree. The fourth loan, for $1.58 million, was approved on November 22, 2006 by defendants Helvey, McCaffree and Sam McCaffree. Like the original $7 million loan, each of the new loans was interest-only and included interest reserves that funded each new loan and replenished the interest-reserves for all prior loans. By the time the fourth loan was made in November 2006, each of the prior loans was delinquent.

62.     On December 5, 2007, all Defendants approved a $17.6 million loan to 11500, LLC to consolidate the four prior loans. Columbian received no new collateral for the loan, conducted no inspections, and failed to document any improvements made to the building. Although the borrower's self-prepared financial statement showed net income of *negative* $247,000, the LAR, again prepared by Helvey, did not explain how the loan would be repaid, other than a cryptic reference to "a possible takeout." The LAR failed to analyze cash flow, DSC, or the guarantors' ability to support the debt.

63.     The same day it made this $17.6 million consolidation loan, Columbian sold a $1.46 million participation to one of McCaffree's entities, McCaffree Financial Corporation.  Although the participation was without recourse, Columbian bought it back -- with accrued interest -- less than four months later.

64.     On January 23, 2008, defendants Helvey, McCaffree and Sam McCaffree approved an $18 million loan to 11500, LLC.  The loan called for 59 monthly payments, the first 11 of which were interest-only.  In addition to renewing the December 2007 loan, Defendants approved the capitalization of accrued interest and the advance of $900,000 in new funds.  The new funds, for which Columbian did not receive any new collateral, included a payment of $242,000 to one of the guarantors.

65.     As with the five prior loans to 11500, LLC, neither the loan file nor the LAR, which Helvey prepared for the $18 million loan contained a cash flow or DSC analysis, documentation of inspections of the collateral, an independent appraisal completed for Columbian, or any financial analysis of the guarantors' ability to service the loan if the borrowing entity, 11500, LLC defaulted.

66.     The loan packages for each of the 11500, LLC  loans that were provided to the defendants demonstrated that the loans were improperly underwritten and failed to meet Columbian's loan policies.  Defendants willfully ignored these deficiencies and approved the loans despite substantial known risks and/or risks that should have been known in the exercise of due diligence.  The loss resulting from the 11500, LLC loan was at least $7,866,850.

**C.     Out-Of-Territory Loans To Keystone Capital Group, Inc. and Related Entities.**

67.     From November 2005 to February 2007, the Defendants approved $15 million in out-of-territory loans to a group of severely undercapitalized limited liability companies to purchase raw land and operate truck stops.  The loans were poorly underwritten, and violated Columbian's own loan policies as well as prudent banking practices.  The borrowers were newly-formed companies with no "track record" of success.  Columbian not only loaned them money to repay the interest on their loans, but also accepted guarantors who were bankrupt and had negative income.  The loans resulted in a loss of at least $9,132,594.

### 1.     $2.6 Million Loan To JAM Land, LLC.

68.     On October 26, 2005, defendants Helvey, McCaffree and Sam McCaffree approved a $2.6 million "bridge loan" to JAM Land, LLC.  JAM Land, LLC was formed by Guarantor A, its manager and sole member, on October 22, 2005, less than three weeks before JAM Land, LLC received the $2.6 million loan.  Guarantor A's father, who had filed for bankruptcy five months earlier, made arrangements for the loan through Venture Commercial Mortgage, LLC ("VCM"), a loan broker from Scottsdale, Arizona.

69.     The loan was to purchase 200 acres of raw land near Buckeye, Arizona for "future residential development and mining of sand and gravel."  Buckeye is a town of approximately 50,000, about 30 miles west of Phoenix.  The LAR, prepared by Helvey and provided to McCaffree and Sam McCaffree, identified the primary source of repayment as sale of property and the secondary source of repayment as "mining operation."  The loan term was six months, interest only.  The only collateral was a mortgage on the 200 acres of raw land.

70.     Helvey had responsibility for underwriting the loan, a task he performed poorly. The loan file was underwritten without an appraisal conducted for Columbian, and no DSC or cash flow or feasibility analysis of the proposed mining operation or development. JAM Land, LLC, as a newly formed limited liability company, had no "track record" and only limited financial information. Guarantor A's financial statement showed an adjusted gross income in 2004 of *negative* $647,961. Her father, also a guarantor, was bankrupt, and a memo to the file waived obtaining his financial statement or tax return.

71.     The loan was not repaid. Rather, it was renewed three times. As discussed below, in February 2007, it was consolidated with other unpaid loans in a $15 million transaction.

### 2.     $3.5 Million Loan To All American Plazas, Inc.

72.     On December 28, 2005, all three Defendants approved a $3.5 million loan for "operating capital" to All American Plazas, Inc. ("AAP"). The collateral was a second mortgage on a truck stop and 50 acres of raw land in Bethel, Pennsylvania. The loan was presented to Columbian by VCM.

73.     The repayment plan in the LAR prepared by Helvey and provided to McCaffree and Sam McCaffree -- "buy out from Able Energy, Inc." -- was speculative at best. The LAR did not contain any meaningful financial information on Able Energy, Inc., AAP or the guarantor.

74.     The loan was poorly underwritten in numerous other respects. The LAR provided to the Defendants did not contain a DSC or cash flow analysis, an appraisal review or any indication of the borrower's or guarantor's ability to repay. AAP's

financial statement showed that most of its assets were pledged against liabilities. Its most recent tax returns showed taxable income of *negative* $125,196.

75.     This loan was not repaid when due. Instead, it was extended twice, and in February 2007 it was consolidated, with a penalty of $166,250, into a $15 million loan to a related entity, Keystone Capital Group, Inc.

### 3.     $6.5 Million Loan To All American Plazas, Inc.

76.     On February 1, 2006, a mere three weeks after approving a $3.5 million loan to AAP for "operating capital," defendants Helvey and Sam McCaffree approved a $6.5 million loan to AAP for additional "operating capital." This new loan, which was again presented by VCM, was secured by first mortgages on truck stops and real estate in Strattanville and Myerstown, Pennsylvania.

77.     The LAR prepared by Helvey, and provided to McCaffree and Sam McCaffree, stated that the loan was to be repaid through the sale of bonds by Able Energy, Inc. in a private placement. This never occurred. The LAR also stated that a $2 million participation would be sold to McCaffree Financial Corporation (owned by McCaffree) and that McCaffree Financial Corporation would receive an origination fee of $60,000. Seven months later, Columbian repurchased the participation from McCaffree Financial Corporation, thus defeating the purpose of the participation (i.e., to reduce Columbian's exposure on the loan).

78.     The loan was poorly underwritten. The LAR provided to defendants did not contain a DSC, cash flow analysis, or an assessment of the borrower's ability to repay. AAP's financial statement showed net income of *negative* $1,506,491.

79.     This loan was not repaid when due.  Instead, it was renewed on August 1

and December 1, 2006 and then consolidated in the $15 million loan to Keystone Capital

Group, Inc. in February 2007.

### 4. $15 Million Loan To Keystone Capital Group, Inc.

80.     As stated above, none of the loans to JAM Land, Inc. or AAP were paid

when due.  Rather than demand repayment, on February 14, 2007, all three Defendants

approved a $15,000,000 loan to Keystone Capital Group, Inc. ("Keystone") to

consolidate the prior loans.  Like the JAM and AAP loans, Keystone was presented to

Columbian by VCM, and all data on the borrowers, loan documentation, terms and

conditions were provided by VCM; no due diligence was conducted or required by the

defendants prior to their approval of the loan.

81.     This $15 million consolidation loan was poorly underwritten.  The LAR,

prepared by Helvey and provided to McCaffree and Sam McCaffree, did not contain a

DSC or cash flow analysis.  The collateral consisted of mortgages on out-of-territory real

estate in Strattanville, Pennsylvania, and Buckeye, Arizona and truck stops in

Pennsylvania.  Defendants did not commission or require Columbian to obtain its own

appraisals, relying instead on appraisals that had been prepared for another entity.  The

borrower's and guarantor's consolidated self-prepared financial statement showed total

*liabilities* of $76.533 million and a net income of negative $4,244,367.

82.     The loan packages for each of the Keystone-related loans that were

provided to the defendants demonstrated that the loans was improperly underwritten and

failed to meet Columbian's loan policies.  Defendants willfully ignored these deficiencies

and approved the loans despite substantial known risks and/or risks that should have been

known in the exercise of due diligence. The resulting loss on the Keystone-related loans was at least $9,132,594.

83.     Defendants McCaffree, Helvey and Sam McCaffree knew, or in the exercise of due diligence should have known, that their approvals of the loans to 11500, LLC, JAM Land, LLC, All American Plazas, Inc. and Keystone Capital Group, Inc. were improper, imprudent, and harmful to Columbian. Among other things, these loans violated Columbian's October 1, 2001 and March 6, 2006 Loan Policies in numerous respects:

- The loans to 11500, LLC were "undesirable" because they were made for speculative purposes on a vacant commercial office building without any signed leases or tenants.

- The loans exceeded loan-to-value limits in violation of Columbia's 2001 and 2006 loan policies.

- Defendants originated and approved these loans, including speculative acquisition and development loans, without takeout commitments by qualified lenders.

- Defendants approved loans to a borrower who lacked adequate funds to complete the project.

- Interest on the loans was capitalized – a strong indication that the borrower lacked the ability to repay the loan.

- Defendants failed to monitor or ensure the monitoring of the performance of these CRE loans to ensure repayment based on cash flow, liquidity, or even liquidation of assets.

- Defendants approved the repurchase of a loan participation from an insider-owned entity (McCaffree Financial Corporation) where the loan had deteriorated in quality and/or had been previously criticized.

- Little or no underwriting was performed on loans to out-of-territory borrowers.

- Real estate appraisals supporting the loans were not current, and were not prepared by independent appraisers selected by Columbian from the list of approved appraisers utilized by Kansas banks.

- The loans lacked current credit information, including financial statements, collateral valuations, lien status, and information about the creditworthiness of the borrowers.

84.   In addition to violating Columbian's Loan Policies, the Defendants also were grossly negligent because they:

- Approved loans without first requiring cash flow analyses, debt service coverage calculations, credit reports on the guarantors, inspections of collateral, proper repayment programs, or evidence of the borrowers' ability to repay.

- Allowed the use of interest and "payment reserves" (interest and principal) on "operating loans."

- Approved loans despite the fact that the guarantors' personal financial statements showed little or no cash or liquid assets, and their most recent tax returns showed little or even negative adjusted gross income.

**D.   Out-Of-Territory Acquisition, Development and Construction Loans to Lockhaven Estates, LLC, Anasazi Downtown, LLC And Copper Square Condominium, LLC**

85.   In 2006 and 2007, Columbian made a series of ill-advised acquisition, development and construction loans in New Mexico to limited liability companies owned and controlled by one owner.  Columbian provided 100% financing for these out-of-territory loans, all of which violated Columbian's loan policies and which resulted in losses estimated at over $15 million.

**1.   $1.8 Million Loan To Lockhaven Estates, LLC.**

86.   On March 15, 2006, defendants Helvey, McCaffree and Sam McCaffree approved a $1.8 million loan to Lockhaven Estates, LLC ("Lockhaven").  The loan was guaranteed by Borrowers B and C.  Lockhaven is a New Mexico limited liability

company formed in October 2004. Its majority owner (70%) was Downtown ABQ

Partners, LLC, a limited liability company owned by Borrowers B and C and formed in

September 2004. The loan was presented to Columbian by VCM.

      87.     The loan was a 24-month, interest-only, loan, with interest payments due

quarterly. Its purpose was to refinance an acquisition and development loan on a

partially completed subdivision of "affordable" (prefabricated) homes in Clovis, New

Mexico, an isolated agricultural community (population just over 30,000) near the West

Texas border and 220 miles from Albuquerque.

      88.     The borrower paid nothing at closing, and received only 63% of the loan

proceeds; the remainder went for the benefit of prior creditors, delinquent taxes, and fees

for VCM.

      89.     Although the LAR provided to McCaffree, Helvey and Sam McCaffree

listed lot sales as the primary source of repayment and the guarantors as a secondary

source, it did not contain any cash flow analysis of the borrower or guarantor or debt

service coverage. The 2004 tax returns of Borrowers B and C showed adjusted gross

income of negative $389,924.

      **2.**     **$16 Million Loan To Anasazi Downtown, LLC And Copper
Square Condominium, LLC.**

      90.     On July 26, 2006, defendants Helvey, McCaffree and Sam McCaffree

approved an $11 million loan to Anasazi Downtown, LLC ("Anasazi"), a New Mexico

limited liability company formed four days earlier by Borrowers B and C. They also

guaranteed the loan. Like the $1.8 million loan to Lockhaven Estates, LLC made less

than four months earlier, the Anasazi loan was presented to Columbian by VCM.

91.     The purpose of the loan was to acquire vacant land in Albuquerque, New Mexico and to construct a seven-story retail/office/residential condominium project.  The loan was interest-only for 15 months.  The borrower contributed no cash at closing.

92.     The LAR provided to McCaffree, Helvey and Sam McCaffree noted that the project was speculative and that Albuquerque had a high crime rate.

93.     The LAR did not contain any cash flow analysis of the borrower or guarantor or any financial information on the borrower.  As described above, the Lockhaven file also showed that the Borrowers B and C's 2004 tax return reported adjusted gross income of negative $389,924.

94.     This $11 million loan was not repaid.  Instead, on June 13, 2007, defendants Helvey, McCaffree and Sam McCaffree approved extending the loan's original maturity date from November 2007 to September 15, 2008.  In addition, Helvey allowed Copper Square Condominium, LLC, a limited liability company formed three months earlier by Borrowers B and C, to use $4,021,441 (less fees for CBT, VCM and others) of the unfunded portion of the $11 million loan commitment to Anasazi to purchase a condominium development in Albuquerque.  The seller was Downtown ABQ Partners, LLC, owned by Borrowers B and C.  In effect, Columbian loaned money to Borrowers B and C to enable them to purchase their own property.

95.     At the time of the advance to Copper Square Condominium, LLC, Columbian did not have financial statements for Anasazi Downtown, LLC or Copper Square Condominium, LLC.  Columbian did have the 2006 tax returns for Anasazi and Borrowers B and C, but the Anasazi return showed a negative net worth of $364,706 and

operating income of negative $77,144, and Borrowers B and C's 2006 tax returns showed reported gross income of negative $339,412.

96.     On October 24, 2007, defendants Helvey, McCaffree and Sam McCaffree approved increasing the Anasazi loan from $11 million to $16 million "to complete the office and residential condominiums." The loan and new funds were committed without updated appraisals, inspections of Anasazi and Copper Square, or a review of the cost to complete the projects. The LAR provided to defendants stated that $4,100,000 in sales proceeds would be used to reduce the loan in the second quarter of 2008. This did not occur.

97.     The loan packages for each of these loans that were provided to the defendants demonstrated that the loans was improperly underwritten and failed to meet Columbian's loan policies. Defendants willfully ignored these deficiencies and approved the loans despite substantial known risks and/or risks that should have been known in the exercise of due diligence. The estimated loss on the Lockhaven, Anasazi/Copper Square loans is at least $15,430,533.

98.     Defendants knew, or in the exercise of due diligence should have known, that their approvals of these loans were improper, imprudent, and harmful to Columbian. Among other things, the loans to Lockhaven Estates, LLC, Anasazi and Copper Square violated Columbian's March 6, 2006 loan policy in numerous respects:

- The loans were made to out-of-territory borrowers with little or no independent underwriting by Columbian's staff.

- The loans were speculative acquisition and development loans. The collateral and borrowers were outside Columbian's trade territory, yet defendants approved the loans with no description of the advantage to Columbian or the financial feasibility of the loans.

- The collateral included unimproved land without an acceptable takeout commitment.

- The appraisals on the real estate were not by an independent appraiser selected by Columbian's staff and the appraiser was not on the list of approved appraisers utilized by Kansas banks.

- Defendants approved the loan without current credit information, including financial statements, collateral valuation, lien status and information about the creditworthiness of the borrowers.

- There was no evidence that Columbian's staff visited the sites to verify the existence and value of the collateral.

99.   In addition to violating Columbian's Loan Policy, the directors and officers of Columbian were also grossly negligent because they:

- Approved an $11 million loan to purchase vacant real estate for $1.3 million.

- Approved the loan, which resulted in Columbian financing 100% of the project, without requiring the borrower to contribute cash.

- Approved the loan without a cash flow analysis and DSC calculations.

- Approved the loan even without the required site inspections of the collateral.

- Approved the loan without evidence of the borrowers' ability, if any, to repay the loan.

- Approved the loan without requiring a proper repayment program.

- Approved the loan terms, which allowed the use of loan proceeds to establish a reserve for interest and loan fees on an acquisition and development loan.

- Approved the loan even though the guarantors' personal financial statements showed little or no cash or liquid assets; their most recent tax return reported adjusted gross income of negative $389,924.

- Approved the loan even without independent appraisals of the collateral from an appraiser on the List of Appraisers certified by the Kansas State Real Estate Appraisal Board.

100.   As shown in the following chart, each of the defendants approved one or more of the loss loans (an "X" denotes the Defendants that approved each loan):

| Loan | Date of Loan Approval | Helvey | Carl McCaffree | Sam McCaffree |
|---|---|---|---|---|
| 11500 LLC | 11/10/04 | X | X | X |
| | 09/14/05 | X | X | X |
| | 07/5/06 | X | X | X |
| | 11/22/06 | X | X | X |
| | 12/05/07 | X | X | X |
| | 01/23/08 | X | X | X |
| Brooke Capital | 12/15/06 | X | X | |
| Northern Capital | 12/27/06 | X | X | X |
| | 09/19/07 | X | X | X |
| Security First | 05/09/07 | X | X | X |
| | 01/30/08 | X | X | X |
| American Integrity | 09/19/07 | X | X | X |
| Brooke Credit | 05/28/08 | X | X | X |
| Keystone Capital | 10/26/05 | X | X | X |
| | 12/28/05 | X | | X |
| | 02/01/06 | X | | X |
| | 02/14/07 | X | X | X |
| Anasazi | 07/26/06 | X | X | X |
| | 10/24/07 | X | X | X |

## CLAIMS FOR RELIEF

### COUNT I
### Gross Negligence – Violation of 12 U.S.C. § 1821(k) – Approval of Loans
### (Defendants McCaffree, Helvey and Sam McCaffree)

101.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-100, above, as if fully set forth in this Count.

102.    During all relevant times, Defendants were executive officers and directors of Columbian.

103.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined

by applicable state law.  Kansas law treats gross negligence as synonymous with wanton conduct – more than ordinary negligence but less than willful injury.

104.     As officers and directors of Columbian, Defendants owed duties to the Bank to carry out their responsibilities by exercising the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  These duties included, but were not limited to, the following:

    a.     To manage, conduct and direct the business and affairs of Columbian in accordance with and to ensure compliance with applicable laws, regulations, bylaws, policies, and sound and prudent banking practices;

    b.     To review carefully the report of examinations and other directives of regulatory agencies, to carry out the instructions and orders contained in any such directives, to investigate problems noted therein, and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

    c.     To attend the meetings of the Board of Directors and the Directors' Loan Committee and to actively review and approve or disapprove each loan and/or investment;

    d.     To take such action as necessary to ensure that Columbian's loans and investments were underwritten, approved, disbursed and collected in accordance with the law, regulations, bylaws and policies applicable thereto and in accordance with sound and prudent banking practices;

e.   To exercise independent judgment in the best interests of Columbian in the conduct of its business and affairs and to avoid conflicts of interest; and

f.   To ensure that Columbian did not engage in any unsafe or unsound practices.

105.   The Defendants breached their duties and were grossly negligent by, *inter alia*, voting to approve one or more of the loans identified in the chart in ¶19 above, and by:

a.   Failing to adhere to applicable laws and regulations.

b.   Failing to heed warnings of bank supervisory authorities.

c.   Extending credit in violation of the Bank's own written loan policies.

d.   Failing to establish adequate debtor repayment programs.

e.   Failing to establish and follow adequate real estate appraisal procedures.

f.   Failing to establish and follow adequate collection procedures.

g.   Permitting conflicts of interest to the detriment of the Bank.

h.   Providing financing for speculative ventures in which the borrowers invested little or no money of their own.

i.   Extending credit to borrowers who were not creditworthy or were known to be in financial difficulty.

j.   Extending credit based on inadequate information concerning the financial condition of prospective borrowers and without adequately analyzing cash flow, debt service coverage and other critical financial information.

k.    Extending credit supported by inadequate or wrongly valued collateral
security.

l.    Extending "short-term" loans without binding take out commitments.

m.    Permitting unsafe and unsound concentrations of credit.

n.    Permitting the improper use of interest reserves and capitalization of
interest.

o.    Failing to employ sound internal controls.

p.    Failing to supervise, manage, conduct, and direct the business and affairs
of the Bank to insure compliance with the by-laws of the Bank, and safe,
prudent principles of banking.

106.    As a direct and proximate result of the Defendants' gross negligence,
Plaintiff suffered damages in an amount in excess of $56,000,000.

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver
of the Columbian Bank and Trust Company, demands trial by jury, and prays for
judgment against Defendants Carl L. McCaffree, Jimmy D. Helvey and Sam McCaffree
in an amount in excess of $56 million, for prejudgment interest, for its costs, and for such
further relief as shall seem just and proper to the Court.

### COUNT II
### Gross Negligence – Violation of 12 U.S.C. § 1821(k) – Failure to Supervise
### (Defendants McCaffree, Helvey and Sam McCaffree)

107.    Plaintiff realleges and incorporates by reference the allegations in
paragraphs 1-106, above, as if fully set forth in this Count.

108.    During all relevant times, Defendants were executive officers and/or
directors of Columbian.

109.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.

110.    As officers and directors of Columbian, Defendants owed duties to the Bank to carry out their responsibilities by exercising the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances. These duties included, but were not limited to, the following:

a.    To manage, conduct and direct the business and affairs of Columbian in accordance with and to ensure compliance with applicable laws, regulations, bylaws, policies, and sound and prudent banking practices;

b.    To exercise reasonable control and supervision over the officers and employees of Columbian;

c.    To review carefully each report of examination of Columbian's affairs as made by the regulatory authorities and to carry out the directions and instructions contained in such reports of examination and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

d.    To attend the meetings of the Board of Directors and the Directors' Loan Committee and to actively review and approve or disapprove each loan and/or investment;

e.    To take such action as necessary to ensure that Columbian's loans and investments were underwritten, approved, disbursed and collected in

accordance with the law, regulations, bylaws and policies applicable thereto and in accordance with sound and prudent banking practices;

f.  To take such action as necessary to ensure that the officers, employees, and agents of the institution complied with the instructions and directions of the Board of Directors;

g.  To exercise independent judgment in the best interests of Columbian in the conduct of its business and affairs and to avoid conflicts of interest; and

h.  To ensure that Columbian did not engage in any unsafe or unsound practices.

111.  The Defendants breached their duties and were negligent by, *inter alia*, failing to exercise adequate supervision over the Bank's officers and employees with respect to one or more of the loans identified in the chart in ¶19 above, and by:

a.  Failing to insure that the Bank's officers and employees adhered to applicable laws and regulations.

b.  Failing to insure that the Bank's officers and employees heeded warnings of bank supervisory authorities.

c.  Failing to properly supervise loan disbursal.

d.  Failing to insure that the Bank's officers and employees did not violate the Bank's own written loan policies.

e.  Failing to insure that the Bank's officers and employees established adequate debtor repayment programs.

f.   Failing to establish, and to insure that the Bank's officers and employees followed, adequate real estate appraisal procedures.

g.   Failing to establish, and to insure that the Bank's officers and employees followed, adequate collection procedures.

h.   Allowing the Bank's officers and employees to engage in conflicts of interest to the detriment of the Bank.

i.   Allowing the Bank's officers and employees to provide financing for speculative ventures in which the borrowers invested little or no money of their own.

j.   Allowing the Bank's officers and employees to extend credit to borrowers who were not creditworthy or were known to be in financial difficulty.

k.   Allowing the Bank's officers and employees to extend credit based on inadequate information concerning the financial condition of prospective borrowers and without adequately analyzing cash flow, debt service coverage and other critical financial information.

l.   Allowing the Bank's officers and employees to extend credit supported by inadequate or wrongly valued collateral security.

m.   Allowing the Bank's officers and employees to extend "short-term" loans without binding take out commitments.

n.   Allowing the Bank's officers and employees to extend unsafe and unsound concentrations of credit.

o.   Allowing the improper use of interest reserves and capitalization of interest.

p.      Failing to employ sound internal controls.

q.      Failing to supervise, manage, conduct, and direct the business and affairs of the Bank to insure compliance with the law, the by-laws of the Bank, and safe, prudent principles of banking.

112.    As a direct and proximate result of the Defendants' gross negligence, Plaintiff suffered damages in an amount in excess of $56,000,000.

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver of the Columbian Bank and Trust Company, demands trial by jury, and prays for judgment against Defendants Carl L. McCaffree, Jimmy D. Helvey and Sam McCaffree in an amount in excess of $56 million, for prejudgment interest, for its costs, and for such further relief as shall seem just and proper to the Court.

## COUNT III
### Negligence – Approval of Loans
### (Defendants McCaffree, Helvey and Sam McCaffree)

113.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-112, above, as if fully set forth in this Count.

114.    Under Kansas law, Executive Officers of banks are personally liable for the negligent breach of their duty of care. "Executive Officers" include the Chairperson of the Board, the President and each Vice-President. McCaffree, as Vice President of Columbian; Helvey, as President of Columbian; and Sam McCaffree as Chairman of the Board of Columbian, were Executive Officers of Columbian. As such, they are personally liable for their negligent breaches of their duty of care.

115.    As directors and executive officers of Columbian, defendants McCaffree, Helvey and Sam McCaffree owed duties to the Bank to conduct its business consistent

with safe and sound lending practices.  These duties included, but were not limited to, the following:

a.    To manage, conduct and direct the business and affairs of Columbian in accordance with and to ensure compliance with applicable laws, regulations, bylaws, policies, and sound and prudent banking practices;

b.    To review carefully each report of examination of Columbian's affairs as made by the regulatory authorities and to carry out the directions and instructions contained in such reports of examination and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

c.    To attend the regular meetings of the Board of Directors and the Directors' Loan Committee and to actively review and approve or disapprove each loan and/or investment;

d.    To take such action as necessary to ensure that Columbian's loans and investments were underwritten, approved, disbursed and collected in accordance with the law, regulations, bylaws and policies applicable thereto and in accordance with sound and prudent banking practices;

e.    To exercise independent judgment in the best interests of Columbian in the conduct of its business and affairs and to avoid conflicts of interest; and

f.    To ensure that Columbian did not engage in any unsafe or unsound practices.

116.     Defendants McCaffree, Helvey and Sam McCaffree breached their duties and were negligent by, *inter alia*, voting to approve one or more of the loans identified in the chart in ¶19 above, and by:

a.     Failing to adhere to applicable laws and regulations.

b.     Failing to heed warnings of bank supervisory authorities.

c.     Extending credit in violation of the Bank's own written loan policies.

d.     Failing to establish adequate debtor repayment programs.

e.     Failing to establish and follow adequate real estate appraisal procedures.

f.     Failing to establish and follow adequate collection procedures.

g.     Permitting conflicts of interest to the detriment of the Bank.

h.     Providing financing for speculative ventures in which the borrowers invested little or no money of their own.

i.     Extending credit to borrowers who were not creditworthy or were known to be in financial difficulty.

j.     Extending credit based on inadequate information concerning the financial condition of prospective borrowers and without adequately analyzing cash flow, debt service coverage and other critical financial information.

k.     Extending credit supported by inadequate or wrongly valued collateral security.

l.     Extending "short-term" loans without binding take out commitments.

m.     Permitting unsafe and unsound concentrations of credit.

n.     Permitting the improper use of interest reserves and capitalization of interest.

o.    Failing to employ sound internal controls.

p.    Failing to supervise, manage, conduct, and direct the business and affairs of the Bank to insure compliance with the law, the by-laws of the Bank, and safe, prudent principles of banking.

117.    As a direct and proximate result of defendants McCaffree's, Helvey's and Sam McCaffree's negligence, Plaintiff suffered damages in an amount in excess of $56,000,000.

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver of the Columbian Bank and Trust Company, demands trial by jury, and prays for judgment against defendants Carl L. McCaffree, Jimmy D. Helvey and Sam McCaffree in an amount in excess of $56 million, for prejudgment interest, for its costs, and for such further relief as shall seem just and proper to the Court.

## COUNT IV
### Negligence – Failure to Supervise
### (Defendants McCaffree, Helvey and Sam McCaffree)

118.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-117, above, as if fully set forth in this Count.

119.    Under Kansas law, Executive Officers of banks are personally liable for the negligent breach of their duty of care. "Executive Officers" include the Chairperson of the Board, the President and each Vice-President. McCaffree, as Vice President of Columbian; Helvey, as President of Columbian; and Sam McCaffree as Chairman of the Board of Columbian, were Executive Officers of Columbian. As such, they are personally liable for their negligent breaches of their duty of care.

120.   As directors and executive officers of Columbian, defendants McCaffree, Helvey and Sam McCaffree owed duties to the Bank to conduct its business consistent with safe and sound lending practices.  These duties included, but were not limited to, the following:

a.   To manage, conduct and direct the business and affairs of Columbian in accordance with and to ensure compliance with applicable laws, regulations, bylaws, policies, and sound and prudent banking practices;

b.   To exercise reasonable control and supervision over the officers and employees of Columbian;

c.   To review carefully each report of examination of Columbian's affairs as made by the regulatory authorities and to carry out the directions and instructions contained in such reports of examination and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

d.   To attend the regular meetings of the Board of Directors and the Directors' Loan Committee and to actively review and approve or disapprove each loan and/or investment;

e.   To take such action as necessary to ensure that Columbian's loans and investments were underwritten, approved, disbursed and collected in accordance with the law, regulations, bylaws and policies applicable thereto and in accordance with sound and prudent banking practices;

f.      To take such action as necessary to ensure that the officers, employees, and agents of the institution complied with the instructions and directions of the Board of Directors;

g.      To exercise independent judgment in the best interests of Columbian in the conduct of its business and affairs and to avoid conflicts of interest; and

h.      To ensure that Columbian did not engage in any unsafe or unsound practices.

121.    Defendants McCaffree, Helvey and Sam McCaffree breached their duties and were negligent by, *inter alia*, failing to exercise adequate supervision over the Bank's officers and employees with respect to one or more of the loans identified in the chart in ¶19 above, and by:

a.      Failing to insure that the Bank's officers and employees adhered to applicable laws and regulations.

b.      Failing to insure that the Bank's officers and employees heeded warnings of bank supervisory authorities.

c.      Failing to properly supervise loan disbursal.

d.      Failing to insure that the Bank's officers and employees did not violate the Bank's own written loan policies.

e.      Failing to insure that the Bank's officers and employees established adequate debtor repayment programs.

f.      Failing to establish, and to insure that the Bank's officers and employees followed, adequate real estate appraisal procedures.

g.     Failing to establish, and to insure that the Bank's officers and employees followed, adequate collection procedures.

h.     Allowing the Bank's officers and employees to engage in conflicts of interest to the detriment of the Bank.

i.     Allowing the Bank's officers and employees to provide financing for speculative ventures in which the borrowers invested little or no money of their own.

j.     Allowing the Bank's officers and employees to extend credit to borrowers who were not creditworthy or were known to be in financial difficulty.

k.     Allowing the Bank's officers and employees to extend credit based on inadequate information concerning the financial condition of prospective borrowers and without adequately analyzing cash flow, debt service coverage and other critical financial information.

l.     Allowing the Bank's officers and employees to extend credit supported by inadequate or wrongly valued collateral security.

m.     Allowing the Bank's officers and employees to extend "short-term" loans without binding take out commitments.

n.     Allowing the Bank's officers and employees to extend unsafe and unsound concentrations of credit.

o.     Allowing the improper use of interest reserves and capitalization of interest.

p.     Failing to employ sound internal controls.

q.    Failing to supervise, manage, conduct, and direct the business and affairs of the Bank to insure compliance with the law, the by-laws of the Bank, and safe, prudent principles of banking.

122.    As a direct and proximate result of the defendants McCaffree's, Helvey's and Sam McCaffree's negligence, Plaintiff suffered damages in an amount in excess of $56,000,000.

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver of the Columbian Bank and Trust Company, demands trial by jury, and prays for judgment against Defendants Carl L. McCaffree, Jimmy D. Helvey and Sam McCaffree in an amount in excess of $56 million, for prejudgment interest, for its costs, and for such further relief as shall seem just and proper to the Court.

**COUNT V**
**Breach of Fiduciary Duty – Approval of Loans**
**(Defendants McCaffree, Helvey and Sam McCaffree)**

123.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-122, above, as if fully set forth in this Count.

124.    The Defendants owed Columbian fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence and fair dealing in the management, conduct and direction of the business of Columbian.  These duties included, but were not limited to, the following:

a.    To manage, conduct and direct the business and affairs of Columbian in accordance with and to ensure compliance with applicable laws, regulations, bylaws, policies, and sound and prudent banking practices;

b.     To exercise reasonable control and supervision over the officers and employees of Columbian;

c.     To review carefully each report of examination of Columbian's affairs as made by the regulatory authorities and to carry out the directions and instructions contained in such reports of examination and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

d.     To attend the regular meetings of the Board of Directors and the Directors' Loan Committee and to actively review and approve or disapprove each loan and/or investment;

e.     To take such action as necessary to ensure that Columbian's loans and investments were underwritten, approved, disbursed and collected in accordance with the law, regulations, bylaws and policies applicable thereto and in accordance with sound and prudent banking practices;

f.     To take such action as necessary to ensure that the officers, employees, and agents of the institution complied with the instructions and directions of the Board of Directors;

g.     To exercise independent judgment in the best interests of Columbian in the conduct of its business and affairs and to avoid conflicts of interest; and

h.     To ensure that Columbian did not engage in any unsafe or unsound practices.

125.   The Defendants breached their fiduciary duties to Columbian by, *inter*

*alia*, voting to approve one or more of the loans identified in the chart in ¶19 above, and by:

a.    Failing to adhere to applicable laws and regulations.

b.    Failing to heed warnings of bank supervisory authorities.

c.    Failing to exercise adequate supervision over the Bank's officers and employees.

d.    Failing to properly supervise loan disbursal.

e.    Extending credit in violation of the Bank's own written loan policies.

f.    Failing to establish adequate debtor repayment programs.

g.    Failing to establish and follow adequate real estate appraisal procedures.

h.    Failing to establish and follow adequate collection procedures.

i.    Permitting conflicts of interest to the detriment of the Bank.

j.    Providing financing for speculative ventures in which the borrowers invested little or no money of their own.

k.    Extending credit to borrowers who were not creditworthy or were known to be in financial difficulty.

l.    Extending credit based on inadequate information concerning the financial condition of prospective borrowers and without adequately analyzing cash flow, debt service coverage and other critical financial information.

m.    Extending credit supported by inadequate or wrongly valued collateral security.

n.    Extending "short-term" loans without binding take out commitments.

o.    Permitting unsafe and unsound concentrations of credit.

p.      Permitting the improper use of interest reserves and capitalization of

interest.

q.      Failing to employ sound internal controls.

r.      Failing to supervise, manage, conduct, and direct the business and affairs

of the Bank to insure compliance with the law, the by-laws of the Bank,

and safe, prudent principles of banking.

126.    As a direct and proximate result of the Defendants' breaches of fiduciary

duty, Plaintiff sustained damages in an amount in excess of $59 million.

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver

of the Columbian Bank and Trust Company, demands trial by jury, and prays for

judgment against Defendants Carl L. McCaffree, Jimmy D. Helvey, Sam McCaffree,

Randolph G. Austin, Richard L. Roach and G. Reid Teaney in an amount in excess of

$56 million, for prejudgment interest, for its costs, and for such further relief as shall

seem just and proper to the Court.

### COUNT VI
### Breach of Fiduciary Duty – Failure to Supervise
### (Defendants McCaffree, Helvey and Sam McCaffree)

127.    Plaintiff realleges and incorporates by reference the allegations in

paragraphs 1-126, above, as if fully set forth in this Count.

128.    The Defendants owed Columbian fiduciary duties, individually and

collectively, to exercise the highest degree of loyalty, care, diligence and fair dealing in

the management, conduct and direction of the business of Columbian.  These duties

included, but were not limited to, the following:

a.   To manage, conduct and direct the business and affairs of Columbian in accordance with and to ensure compliance with applicable laws, regulations, bylaws, policies, and sound and prudent banking practices;

b.   To exercise reasonable control and supervision over the officers and employees of Columbian;

c.   To review carefully each report of examination of Columbian's affairs as made by the regulatory authorities and to carry out the directions and instructions contained in such reports of examination and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

d.   To attend the regular meetings of the Board of Directors and the Directors' Loan Committee and to actively review and approve or disapprove each loan and/or investment;

e.   To take such action as necessary to ensure that Columbian's loans and investments were underwritten, approved, disbursed and collected in accordance with the law, regulations, bylaws and policies applicable thereto and in accordance with sound and prudent banking practices;

f.   To take such action as necessary to ensure that the officers, employees, and agents of the institution complied with the instructions and directions of the Board of Directors;

g.   To exercise independent judgment in the best interests of Columbian in the conduct of its business and affairs and to avoid conflicts of interest; and

h.     To ensure that Columbian did not engage in any unsafe or unsound practices.

129.   The Defendants breached their fiduciary duties to Columbian by, *inter alia*, failing to exercise adequate supervision over the Bank's officers and employees with respect to one or more of the loans identified in the chart in ¶19 above, and by:

a.     Failing to insure that the Bank's officers and employees adhered to applicable laws and regulations.

b.     Failing to insure that the Bank's officers and employees heeded warnings of bank supervisory authorities.

c.     Failing to properly supervise loan disbursal.

d.     Failing to insure that the Bank's officers and employees did not violate the Bank's own written loan policies.

e.     Failing to insure that the Bank's officers and employees established adequate debtor repayment programs.

f.     Failing to establish, and to insure that the Bank's officers and employees followed, adequate real estate appraisal procedures.

g.     Failing to establish, and to insure that the Bank's officers and employees followed, adequate collection procedures.

h.     Allowing the Bank's officers and employees to engage in conflicts of interest to the detriment of the Bank.

i.     Allowing the Bank's officers and employees to provide financing for speculative ventures in which the borrowers invested little or no money of their own.

j.    Allowing the Bank's officers and employees to extend credit to borrowers who were not creditworthy or were known to be in financial difficulty.

k.    Allowing the Bank's officers and employees to extend credit based on inadequate information concerning the financial condition of prospective borrowers and without adequately analyzing cash flow, debt service coverage and other critical financial information.

l.    Allowing the Bank's officers and employees to extend credit supported by inadequate or wrongly valued collateral security.

m.    Allowing the Bank's officers and employees to extend "short-term" loans without binding take out commitments.

n.    Allowing the Bank's officers and employees to extend unsafe and unsound concentrations of credit.

o.    Allowing the improper use of interest reserves and capitalization of interest.

p.    Failing to employ sound internal controls.

q.    Failing to supervise, manage, conduct, and direct the business and affairs of the Bank to insure compliance with the law, the by-laws of the Bank, and safe, prudent principles of banking.

130.    As a direct and proximate result of the Defendants' breaches of fiduciary duty, Plaintiff sustained damages in an amount in excess of $56 million.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver of the Columbian Bank and Trust Company, demands trial by jury, and prays for

judgment against Defendants Carl L. McCaffree, Jimmy D. Helvey and Sam McCaffree

in an amount in excess of $56 million, for prejudgment interest, for its costs, and for such

further relief as shall seem just and proper to the Court.

**DEMAND FOR JURY**

Plaintiff demands trial by jury.

Respectfully submitted,

McANANY, VAN CLEAVE & PHILLIPS, P.A.
10 E. Cambridge Circle Drive, Suite 300
Kansas City, Kansas 66103
913-371-3838
FAX # 913-371-4722
cgetto@mvplaw.com
lgreenbaum@mvplaw.com
dgreenwald@mvplaw.com

By      /s/ Charles A. Getto_____
        Charles A. Getto, #09895

Attorneys for Plaintiff, Federal Deposit Insurance
Corporation as Receiver of The Columbian Bank
and Trust Company

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2012, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Mr. Michael Thompson
Ms. Lyndsey J. Conrad
**Husch Blackwell LLP**
4801 Main Street, Suite 1000
Kansas City, MO 64112
*Attorneys for Defendants Sam McCaffree*
*and Carl L. McCaffree*

Ms. Teresa A. Woody
**Woody Law Firm PC**
1621 Baltimore Ave.
Kansas City, MO 64108
*Attorneys for Defendant Jimmy D. Helvey*


/s/Charles A. Getto
Charles A. Getto