IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, | ) | |
| As Receiver of the Columbian Bank & Trust Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11-CV-2447 JAR/KGS |
| vs. | ) | |
| | ) | |
| CARL L. McCAFFREE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS CARL McCAFFREE'S AND SAM McCAFFREE'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL

Defendants Carl McCaffree and Sam McCaffree ("Defendants") respectfully submit this Memorandum In Support Of Their Motion To Compel.

Plaintiff FDIC's lawsuit alleges negligence in the lending and underwriting practices of Columbian Bank & Trust ("Columbian" or the "Bank") and seeks nearly $59 million dollars from the three remaining individual Defendants for losses allegedly incurred by the Bank. As such, Plaintiff's Amended Complaint contains numerous allegations related to the loan files, underwriting materials, and loan packages (i.e., Loan Approval Requests ("LARs") and attachments thereto) maintained at Columbian Bank, which Plaintiff claims prove that Defendants, members of Columbian's Board of Directors, were negligent or breached fiduciary duties owed to Columbian when they voted to approve 20 large commercial loans (including consolidation loans) from 2004 through 2008.

Plaintiff, as receiver of Columbian, seized all of the Bank's files and records when the Bank was closed in 2008. As a result, Defendants have to rely exclusively on production of documents by their opponent to build their defense against the substantial allegations raised in this case. Given that the loan packages, loan files, and the documents comprising the

underwriting process are at the heart of the allegations in the Amended Complaint, it should have come as no surprise to Plaintiff that Defendants' First Interrogatories and First Requests for Production of Documents ("RFP" or "RFPs")—served more than four months ago—sought identification and production of these documents. Despite these requests, and numerous follow-up requests, Plaintiff has failed to produce or make these documents available as they existed within the usual course of business while the Bank was in operation.[1] Instead, Plaintiff has attempted to drown Defendants in a sea of unorganized chaos by creating a database containing a quarter of a million documents at, quite possibly, more than a million pages, with no mechanism whatsoever for Defendants to identify the loan packages, loan files, or underwriting materials as they existed in the Bank.

Through Defendants' diligent efforts to uncover the material documents in this case, Defendants have now learned that many of the documents responsive to these requests and other RFPs have been sitting at Citizens Bank and Trust Company ("Citizens Bank"—the bank that purchased Columbian's insured deposits and certain of its assets from the FDIC) for the last four years and *are not even in the million-page database*. Despite having access to and control over these documents, Plaintiff apparently made no attempt to obtain them until only recently, and Defendants still do not have them. Defendants also recently learned from Plaintiff that other responsive documents, including original loan files for many of the relevant loans, were given to the entities that purchased these loans post-receivership and that Plaintiff failed to ensure that a

---

[1] In accordance with D. Kan. R. 37.2 and Fed. R. Civ. P. 37(a)(1), the parties have made reasonable efforts to confer and resolve the parties' differences without resorting to motion practice, having exchanged written correspondence—much of which is cited in support of this Motion, and holding a telephonic conference on August 8, 2012. *See* Declaration of Lyndsey J. Conrad In Support Of Carl And Sam McCaffree's Motion To Compel ("Conrad Decl.").

copy was maintained for use in this lawsuit.  Given the deadline for filing a motion to compel,[2] and due to the impact Plaintiff's continued delay in producing responsive documents has on Defendants' ability to mount a defense, Defendants had no choice but to file this Motion To Compel.

For the reasons discussed below, Defendants seek an order compelling Plaintiff to obtain documents responsive to their First RFPs from Citizens Bank, to properly identify and/or produce the loan packages, to produce the loan files and underwriting materials as they were kept in the usual course of business, and to supplement its responses to certain Interrogatories and RFPs as it previously agreed to do.

## BACKGROUND

### A.  Plaintiff's Allegations

Plaintiff seeks approximately $59 million in damages it claims were suffered as losses on the loans identified in the Amended Complaint.  Ex. 1 (Plaintiff's Response to Interrogatory 15). Plaintiff makes no fewer than 23 separate allegations related to the contents of the loan packages, the loan files, and the underwriting materials, including the following:

- "The LAR did not contain a cash flow or debt service coverage ('DSC') analysis [for the loan to Brooke Capital], and lacked a listing and aging of the accounts receivable pledged as collateral."  Amended Compl. ¶ 27.

- "The loan package provided to the defendants demonstrated that [the loan to Brooke Capital] was improperly underwritten and failed to meet Columbian's loan policies." Amended Compl. ¶ 28.

- "The LAR provided to Helvey, McCaffree and Sam McCaffree did not contain a cash flow or DSC analysis, or consolidated financial statements for the borrower [Northern Capital, Inc.] and its related entities."  Amended Compl. ¶ 32.

---

[2]     Pursuant to D. Kan. R. 37.1(b), Defendants had 30 days from the date of the default to file a motion to compel.  Defendants sought two unopposed extensions of that deadline, Docs. 67 & 71, which the Court granted, Docs. 69 & 72, thereby making Defendants' deadline for this Motion To Compel August 21, 2012.  *See* Doc. 72.

- The "defendants approved the loan participation [in a loan by Brooke Credit to Northern Capital"] without reviewing a new LAR or any cash flow or DSC analysis."  Amended Compl. ¶ 35.

- "The LAR [for the purchase of a participation in a loan by Brooke Credit to Security First Insurance Holdings, Inc.] provided to [Defendants] relied on a Credit Memorandum prepared by Brooke Credit, which was attached to the LAR."  Amended Compl. ¶ 39.

- "The LAR provided to the defendants showed Security First Insurance Holdings had a negative net worth of $219,748, a net loss of $914,779 in 2005 and only $81,092 in net income in 2006."  Amended Compl. ¶ 41.

- "The LAR provided to defendants [for a participation in a loan by Brooke Credit to Security First Insurance Holdings] did not contain a cash flow or DSC analysis prepared by anyone at the Bank, or a consolidated financial statement for Security First Insurance Holdings and its related entities."  Amended Compl. ¶ 43.

- "Columbian's LAR did not contain a cash flow, DSC analysis, or a consolidated financial statement for the borrower and its related entities.  Instead, defendants . . . approved Columbian's purchase of [a loan participation in a loan by Brooke Credit to American Integrity Insurance Group] based on a credit memorandum prepared by Brooke."  Amended Compl. ¶ 49.

- "[T]here was a complete disconnect between what Columbian stated [in the LAR] its participation [in a loan by First State Bank of Gothenburg to Brooke Credit] would be used for (to pay off failed start-up franchise loans that Columbian had purchased from Brooke Credit) and what Brooke Credit stated [in a credit memorandum attached to the LAR] the loan proceeds would be used for (to pay off other creditors of Brooke)."  Amended Compl. ¶ 53.

- "Helvey noted in a memo in the [11500, LLC] loan file, '[w]e have not required credit reports on the individual Guarantors.  The strength of the loan is based on the collateral of the building, rather than the Guarantors."  Amended Compl. ¶ 58.

- "Columbian's loan file [for a loan to 11500, LLC] contained no DSC or cash flow analysis, and no financial statements on this new limited liability company or its guarantors."  Amended Compl. ¶ 60.

- "[T]he LAR [for the $17.6 million consolidated loan to 11500, LLC], again prepared by Helvey, did not explain how the loan would be repaid other than a cryptic reference to 'a possible takeout.'  The LAR failed to analyze cash flow, DSC, or the guarantors' ability to support the debt."  Amended Compl. ¶ 62.

- "As with the five prior loans to 11500, LLC, neither the loan file nor the LAR which Helvey prepared for the $18 million loan [to 11500, LLC] contained a cash flow or DSC analysis, documentation of inspections of the collateral, an independent appraisal

completed for Columbian, or any financial analysis of the guarantors' ability to service the loan if the borrowing entity, 11500, LLC defaulted." Amended Compl. ¶ 65.

- "The loan packages for each of the 11500, LLC loans that were provided to the defendants demonstrated that the loans were improperly underwritten and failed to meet Columbian's loan policies." Amended Compl. ¶ 66.

- "The loan file [for the loan to JAM Land, LLC] was underwritten without an appraisal conducted for Columbian, and no DSC or cash flow or feasibility analysis of the proposed mining operation or development." Amended Compl. ¶ 70.

- "The repayment plan in the LAR prepared by Helvey and provided to McCaffree and Sam McCaffree [for the loan to All American Plazas, Inc.] – 'buy out from Able Energy, Inc.' – was speculative at best. The LAR did not contain any meaningful financial information on Able Energy, Inc., AAP or the guarantor." Amended Compl. ¶ 73.

- "The loan [to AAP] was poorly underwritten in numerous other respects. The LAR provided to the Defendants did not contain a DSC or cash flow analysis, an appraisal review or any indication of the borrower's or guarantor's ability to repay." Amended Compl. ¶ 74.

- "The LAR [for another loan to AAP] provided to defendants did not contain a DSC, cash flow analysis, or an assessment of the borrower's ability to repay." Amended Compl. ¶ 78.

- "[A]ll three Defendants approved a $15,000,000 loan to Keystone Capital Group, Inc. ('Keystone') to consolidate the prior loans. Like the JAM and AAP loans, Keystone was presented to Columbian by VCM, and all data on the borrowers, loan documents, terms and conditions were provided by VCM; no due diligence was conducted or required by the defendants prior to their approval of the loan." Amended Compl. ¶ 80.

- "The LAR [for the Keystone loan], prepared by Helvey and provided to McCaffree and Sam McCaffree, did not contain a DSC or cash flow analysis." Amended Compl. ¶ 81.

- "The loan packages for each of the Keystone-related loans that were provided to the defendants demonstrated that the loans was [sic] improperly underwritten and failed to meet Columbian's loan policies." Amended Compl. ¶ 82.

- "Although the LAR [for the Lockhaven Estates, LLC loan] provided to [Defendants] listed lot sales as the primary source of repayment and the guarantors as a secondary source, it did not contain any cash flow analysis of the borrower or guarantor or debt service coverage." Amended Compl. ¶ 89.

- "The LAR [for the Anasazi Downtown, LLC loan] did not contain any cash flow analysis of the borrower or guarantor or any financial information on the borrower." Amended Compl. ¶ 93.

Plaintiff repeatedly alleges that Defendants "willfully ignored" the "deficiencies" purportedly shown in the loan packages, loan files, and underwriting materials and "approved the loan[s] despite substantial known risks and or risks that should have been known in the exercise of due diligence." *See* Amended Compl. ¶ 43; *see also id*. ¶¶ 55, 66, 82, 97.

### A.  The Bank's Document Filing System

The Bank had a dual filing system for its loan files.  Ex. 10, Declaration of Mark McCaffree ("McCaffree Decl.") ¶¶ 5-6.  Most of the loan-related documents were maintained in hardcopy form in a central file in the branch of the Bank from which the loan originated.[3]  *Id*. at ¶¶ 5, 19.  The Bank also utilized an electronic document management system called DocStar.  *Id*. at ¶ 6.  Generally, the documents contained in the hardcopy files would be scanned and saved into the DocStar system.  *Id*. at ¶ 17.  But the DocStar version of the loan file may be incomplete if, for example, documents had not yet been scanned and saved there or were inadvertently omitted.  *Id*. at ¶ 18.

Within each system (hardcopy and DocStar), the Bank maintained a "loan file" for each of its loans.  *Id*. at ¶¶ 7, 14.  The hardcopy files were identified by labels or tabs on the file folder that included the loan name (typically the borrower) and unique loan number.  *Id*. at ¶ 8.  In DocStar, an electronic file-folder bearing the borrower's name would contain another folder for each loan, generally named by the loan number.  *Id*. ¶ 15.  If the Bank had more than one loan with a customer, it would also maintain a "Master" loan file that contained documents pertinent to more than one loan.  *Id*. at ¶¶ 9, 15.  This was to avoid duplicative documents appearing in each of the respective loan files.  *Id*. at ¶ 10.  Thus, to obtain all of the important records for any one loan, one must look in both the Master file and the individual loan file(s).  *Id*. ¶ 13.

---

[3]        All loans at issue in the Amended Complaint were originated in the Overland Park branch location so that is where the loan files for these loans would have been maintained.

In addition, the loan officer who originated or serviced the loan held records related to underwriting, origination, and/or servicing in files in his or her office and on his or her computer. *Id.* at ¶ 19; Ex. 11, Helvey Decl. ¶¶ 5-7.

## B. Defendants' Discovery Requests & Plaintiff's Responses

To obtain the crucial information and records needed to mount a defense, Defendants propounded the following discovery on April 13, 2012 (Doc. 49):

### Interrogatory 3

For each loan sued upon in the Complaint, specify each and every document (through identification by Bates number, Relativity document identifier, or otherwise) consisting of the complete 'loan package' or 'loan file' (including each Loan Approval Request and all documents accompanying or attached thereto) that was presented to the Loan Committee and/or Board of Directors at the time approval of the loan, loan renewal, or loan consolidation was sought.

### Request for Production 37

All documents in Columbian's loan approval files ("loan packages") for each loan identified in the Complaint, including but not limited to, all documents attached to, accompanying, or supporting each LAR.

### Request for Production 38

All documents created by Columbian or other entities which became part of the underwriting process for the loans identified in the Complaint, including but not limited to:

> a.   materials provided to Columbian by Venture Commercial Mortgage, LLC
>
> b.   materials provided by Brook Credit or Brooke Capital, and specifically Brooke Credit's credit memorandums and all underlying documentation provided by Brook Credit which support the credit memorandums, and
>
> c.   materials provided by Freestand Commercial.

### Request for Production 39

All documents located within Columbian's DocStar system (electronic filing system) for each loan identified in the Complaint.

**Request for Production 50**

All documents in Columbian's files or otherwise created or compiled in the underwriting process for each loan <u>renewal</u> or <u>consolidation</u> identified in the Complaint, including but not limited to all documents included with, attached to, presented with, or supporting the loan renewal LAR.

Ex. 1 (Plaintiff's Responses to Defendants' First Interrogatories); Ex. 2 (Plaintiff's Responses to Defendants' First RFPs).  Plaintiff raised no specific objections to these requests.  In response to Interrogatory 3, the FDIC simply responded, "Please refer to the Loan Approval Requests that were previously produced, bates numbers FDIC-R001223-001454."  Ex. 1 (Plaintiff's Response to Interrogatory 3).  This referred to 231 of approximately 15,000 pages of documents produced to Defendants in the Summer of 2011 in advance of a pre-litigation mediation.

Likewise, Plaintiff's responses to RFP 37, 38, 39, and 50 were materially identical.  Plaintiff stated, "These documents have been made available to defendants on Relativity" or "[t]o the best of plaintiff's knowledge, to the extent these documents were present at the bank on August 22, 2008, they have been made available to defendants on Relativity."  Ex. 2 (Plaintiff's Responses to Defendants' First RFPs).

Upon receiving Plaintiff's responses to Defendants' opening discovery, it was immediately apparent to Defendants that the documents Plaintiff identified as "the complete 'loan package' or 'loan file' . . . that was presented to the Loan Committee and/or Board of Directors at the time approval of the loan, loan renewal, or loan consolidation" were not, in fact, the complete loan packages.  The materials submitted to the Board to approve any given loan included a document titled "Loan Approval Request" or "LAR."  In addition to the LAR, the loan officer would select various supporting documents to obtain approval.  At times, the supporting documents were specifically mentioned in the LAR.  Other times, they were not.  Plaintiff identified 56 total pages as being the "loan packages" for all six of the loans to 11500,

LLC.  Ex. 3 (FDIC-R001223-1278).  There are a number of significant documents missing from those identified as the 11500, LLC loan packages.  For example, the LAR for the first loan to 11500, LLC (in the amount of $7 million) notes that a "packet" of information concerning the borrower and a listing of tenants who had signed letters of intent were attached.  Ex. 3 (FDIC-R001223).  Those documents were not among the 56 pages identified by Plaintiff.  The LAR for the second loan to 11500, LLC (in the amount of $6,115,785) states that a financial analysis of 11500, LLC, the cost sheet for a tenant finish, the guaranty of lease signed the parent company of a tenant, and a letter certifying that all proper environmental regulations have been followed were attached.  *Id.* (FDIC-R001224).  None of these documents were among the 56 pages identified by Plaintiff.  And, the LAR for the third loan to 11500, LLC (in the amount of $2,900,000) is not among the documents identified at all.[4]  Untold other documents not specifically mentioned in the LARs are omitted.  There are similar omissions from the documents Plaintiff identified as representing loan packages for other loans.  In short, the documents Plaintiff initially identified bear no resemblance whatsoever to the loan packages presented to the Directors for approval.

In addition, because Plaintiff represented in its responses to RFPs 37, 38, 39, 50 that all documents in the Bank's loan files (both the hard copy and DocStar files) and underwriting materials had been made available in Relativity, Defendants were led to believe that at least two copies of each loan file and Master loan file existed in the database for the loans at issue in the Amended Complaint—the hardcopy from the Bank branch and the electronic copy that existed in

---

[4]     Some LARs for *renewals* of the $2,900,000 loan to 11500, LLC are included.

DocStar.[5]  In addition, Defendants were led to believe that a complete copy of any additional underwriting materials were in Relativity.  Although there were many documents related to the relevant loans and borrowers, Defendants have been unable to locate anything that resembled a loan or underwriting file.  Accordingly, Defendants asked Plaintiff by e-mail to identify by Relativity ID the documents that are responsive to each request.  At the same time, Defendants asked for access to the hardcopy files so that they may inspect them in their original form.

Plaintiff responded by providing Relativity IDs for what it termed the hardcopy "loan files," which were loaded into Relativity with the "custodian" field reflecting that they came from "McCaffree's Counsel."  Ex. 4, July 11, 2012 e-mail from C. Getto & July 17, 2012 e-mail from A. Harse.  As a result, Defendants were led to believe that the documents Plaintiff identified as the "loan files" were obtained from Bryan LaGree, who was an attorney for McCaffree Financial Corporation and bore no responsibility for maintaining the Bank's loan files.  *Id.* at July 17, 2012 e-mail from A. Harse.  It was not until July 20, 2012 that Plaintiff informed Defendants that those documents were not obtained from Bryan LaGree, but were identical copies of the documents it had provided to counsel for the Defendants in Summer 2011.  *Id.* at July 20, 2012 e-mail from C. Getto.  In addition to the obvious delay this caused, this

---

[5]      Through conversations with counsel for Plaintiff, Defendants understood that the FDIC imaged all of the hardcopy documents at the Bank at closing.  This impression was confirmed when (1) in response to most of Defendants' RFPs, Plaintiff stated, "to the best of plaintiff's knowledge, to the extent these documents were present at the bank on August 22, 2008," these documents have been made available in Relativity; (2) in response to many RFPs, Plaintiff stated that it would provide Defendants "with an inventory of documents that were present at the Bank on August 22, 2008," (3) in response to Interrogatory 10, which asked Plaintiff to identify and describe all procedures or steps taken by the FDIC to collect documents, Plaintiff did not indicate that only a selection of hardcopy documents were imaged, and (4) in response to RFP 80, which sought Plaintiff's document collection and preservation policies applied to investigations of failed banks or to Columbian's documents, Plaintiff did not produce any documents reflecting limitations, guidelines, or instructions on which hard copy documents should be collected and preserved. Exs. 1 & 2.

seemed to indicate that the metadata fields in Relativity were not accurately or sufficiently populated. In addition, it showed that Plaintiff's earlier representation that there "is no practical way to identify in Relativity the documents that were produced to you last summer in the course of our mediation" was not true.[6]   Ex. 5, June 12, 2012 e-mail from C. Getto.

In any event, the documents Plaintiff identified as the "loan files" clearly were not. Although Plaintiff repeatedly described these documents as being the "target loan files" "captured at closing," *see* Ex. 4, July 20, 2012 e-mail from C. Getto[7] & July 27, 2012 e-mail from C. Getto, they omitted many documents known to be in the files maintained by the Bank and included FDIC-generated documents from well after the Bank closed.[8]   For example, for each of the large commercial loans secured by real property, the loan files contained photographs of the collateral, including photographs depicting Jim Helvey inspecting the property. Ex. 11, Helvey Decl. ¶¶ 1-2. There are no such photographs in the range of documents Plaintiff alleges

---

[6]     Because Defendants agreed to pay $0.06 per page for each document they seek to obtain from Relativity, Defendants asked Plaintiff to identify by Relativity ID the documents that were produced in Summer 2011 to avoid the cost of obtaining documents they already had. Ex. 5, June 8, 2012 e-mail from A. Harse. Plaintiff told Defendants that it was impossible to make such an identification. *Id.* at June 12, 2012 e-mail from C. Getto. That, clearly, was incorrect.

[7]     In the same e-mail, Plaintiff said that "[t]o the best of our knowledge, the documents on the CDs furnished to your firm on July 18, 2011, and made available on Relativity earlier this year, are copies of the target loan files as they existed at the bank and as they were captured by the FDIC." Ex. 4, July 20, 2012 e-mail from C. Getto.

[8]     Indeed, Plaintiff identified 4,495 total pages as comprising the loan files for 10 of the loans at issue in the Amended Complaint—the loan to Brooke Capital, the participation in the loan to Brooke Credit, the participations in the loans to Security First Insurance Holdings, the loan to Keystone Capital, the participations in the loans to Northern Capital, the Copper Square Condominium loan, and the participations in the loan to American Integrity. Ex. 4, July 11, 2012 e-mail from C. Getto (totaling the Bates ranges for each of these loans yields 4,495 pages). Plaintiff has recently informed Defendants, however, that the original loan files for these loans, which are currently in another bank's possession, total *10,000 to 12,000 documents*. Ex. 12, August 17, 2012 e-mail from C. Getto.

are the loan files.  In addition, the range of documents includes documents created well after the Bank closed—at times, as late as February 2009.  Ex. 6.

Further compounding the problem is that Plaintiff has not (and apparently cannot) identify the DocStar version of the loan files.  On July 11, 2012, Plaintiff told Defendants that, although it captured all the documents available in DocStar, it chose not to preserve DocStar's foldering system.   Ex. 4, July 11, 2012 e-mail from C. Getto.  Plaintiff said that Defendants can "reassemble" the files by searching for the loan number or the term "Master file" combined with the names of the various target loans.[9]   *Id*.    But, as indicated above, documents in the Master files are only one small subset of the total volume of documents comprising the complete  loan files and may not be a complete copy of the hardcopy Master file.

It was not until August 8, 2012, during a meet-and-confer conference regarding Plaintiff's responses to Defendants' discovery requests that Defendants first learned that Plaintiff did not image the entire universe of hardcopy documents at the Bank.  *See supra* n. 5 (describing Plaintiff's repeated misrepresentations that it had imaged and provided Defendants access to all of the hardcopy documents at the Bank on the day it closed).  During the same meet-and-confer, Plaintiff admitted that it may not have even copied the loan files for the loans at issue in the

---

[9]        Despite telling Defendants on July 11, 2012 that they could "reassemble" the loan files by running search terms—which, as discussed *infra* Section D, they should not be required to do—that actually was not possible until nearly a month later.  Until August 10, 2012, Plaintiff had suppressed the metadata field that allowed Defendants to determine whether a particular document came from DocStar.  Ex. 7, August 10, 2012 e-mail from C. Getto.  Prior to that time, there were only 226 records shown as originating from DocStar—all apparently from the Master files related to certain borrowers.  The newly-available metadata field offers further information about the DocStar documents and may allow Defendants the ability to organize the DocStar documents by loan, but Defendants still will not be able to recreate the complete file structure or manner in which the documents were organized within DocStar.  Defendants also do not have a clear picture of whether they actually have everything they requested from DocStar or whether additional relevant documents were stored in a way that has not been captured by the process Plaintiff utilized to retrieve the DocStar documents it has provided.

Amended Complaint as they existed in the Bank at closing.  It also became clear that the FDIC did not remove *any* documents from the computers of the loan officers responsible for originating or servicing many of the loans at issue in the Amended Complaint, and which contained some of the relevant underwriting materials.[10]  Thus, as it turns out, "to the best of Plaintiff's knowledge," these documents *have not* been made available to Defendants on Relativity.

At the same time, however, Plaintiff admitted that it still has access to and control over the relevant documents (assuming they still exist).  Indeed, the Purchase and Assumption Agreement between Plaintiff and Citizens Bank provides, in relevant part:

> **3.6 Assets Essential to Receiver**
>
> (a) The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to assign, transfer, convey, and deliver to the Receiver all of the Assuming Bank's right, title and interest in and to, any Assets or asset essential to the Receiver as determined by the Receiver in its sole discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Asset or asset that the Receiver determines to be:
> . . .
> (ii) the subject of any investigation related to any claim with respect to [among other things, a action or claim against any officer, director, or employee employed by the Failed Bank] or the subject of, or potentially the subject of, any legal proceedings" . . .
>
> (v) related to any asset of the Failed Bank not purchased by the Assuming Bank . . . .

---

[10]    Plaintiff identified several employees of the Bank and had their laptop and/or desktops imaged at closing. Ex. 8, May 3, 2012 e-mail from C. Getto.  Plaintiff did not, however, collect documents from any computer used by individuals who originated or serviced several of the loans at issue in the Complaint—Gary Fruits, who originated and serviced the Anasazi Downtown, LLC loans, Troy Bettis, who originated and serviced all of the loans related to the Brooke entities, and Mary Romero, who serviced the 11500, LLC loans.  *See id.* (listing "FDIC designated individuals"); Ex. 11, Helvey Decl. ¶¶ 5-7.  Moreover, Plaintiff may have failed to collect and make available to Defendants hardcopy documents received, created, or maintained by these individuals, which Defendants just learned.  *See supra* n. 5.

. . .

**6.3 Preservation of Records.**  The Assuming Bank agrees that it will preserve and maintain for the joint benefit of the Receiver, the Corporation and the Assuming Bank, all Records of which it has custody for such period as either the Receiver or the Corporation in its discretion may require, until directed otherwise, in writing, by the Receiver or Corporation.  The Assuming Bank shall have the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody.

**6.4 Access to Records; Copies**.  The Assuming Bank agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Bank had custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested[.]

. . .

**9.6  Proceeding with Respect to Certain Assets and Liabilities**

(a)      In connection with any investigation, proceeding or other matter with respect to any asset or liability of the Failed Bank retained by the Receiver, or any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement, the Assuming Bank shall cooperate to the extent reasonably required by the Receiver.

(b)      In addition to its obligations under Section 6.4, the Assuming Bank shall provide representative of the Receiver access at reasonable time and locations without other limitation or qualification to . . . . its books and records . . . and all Loan Files. . . ."[11]

Ex. 9 (Purchase and Assumption Agreement); Ex. 2 (Plaintiff's Responses to Defendants' RFP 86).

Plaintiff admitted at the meet-and-confer that, to that point, it had made no effort to obtain any documents responsive to Defendants' RFPs from Citizens Bank.  Since the meet-and-confer, Plaintiff has apparently asked Citizens Bank whether it has any of the relevant loan files and/or hard drives from computers used by Troy Bettis, Gary Fruits, and Mary Romero.  Ex. 7, August 10, 2012 e-mail from C. Getto.

---

[11]      **13.12 Term of Agreement**.  This Agreement shall continue in full force and effect until the sixth (6th) anniversary of the Bank Closing Date; provided, that the provisions of Section 6.3 and 6.4 shall survive the expiration of this Agreement.  Ex. 9 (Purchase and Assumption Agreement).

## ARGUMENT AND AUTHORITIES

### A.  Standard On A Motion To Compel

A party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things." Fed. R. Civ. P. 26(b)(1).  A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or has provided evasive or incomplete responses.  Fed. R. Civ. P. 37(a)(3)-(4).

### B.  Government Agencies, As Litigants, Have The Same Responsibility To Comply With Discovery Rules As Private Litigants, And Plaintiff's Duties As A Litigant Arose No Later Than August 22, 2008

Plaintiff apparently believes that complying with its statutorily-imposed duties as a receiver fulfills any duty it has in discovery.  *See* Ex. 4, July 20, 2012 e-mail (stating, in response to Defendants' inquiries about Plaintiff's document production, "The FDIC believes . . . that it has fulfilled its statutory obligations as receiver of this failed Kansas bank.").  To the contrary, "[l]ike any ordinary litigant, the Government must abide by the Federal Rules of Civil Procedure. It is not entitled to special consideration concerning the scope of discovery, especially when it voluntarily initiates an action." *S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 414 (S.D.N.Y. 2009).

Plaintiff had a duty to preserve documents and evidence as soon as it anticipated potential litigation.  *Lakes Gas Co. v. Clark Oil Trading Co.*, 2012 WL 2366702, 20 (D. Kan. 2012) (stating that a party has a duty to preserve evidence when it knows, or should have known, that litigation is imminent).  This occurred no later than August 22, 2008, as evidenced by the fact that the FDIC presented a letter to Columbian Vice President Mark McCaffree that day purporting to give notice of potential claims against the directors and officers of the Bank.  Ex.

10, McCaffree Decl. ¶ 20.  Thus, at the time Plaintiff was collecting documents for use in its

capacity as a receiver, it also had a duty to prevent the destruction or significant alteration of

evidence in its capacity as a potential litigant.[12]

**C. Plaintiff Did Not Perform A Reasonable Search For Documents In Response To Defendants' RFPs Because It Has Not Obtained Documents From Citizens Bank**

Under Fed. R. Civ. P. 34, "[a] party must produce nonprivileged relevant documents in

response to a request for production that are in the producing party's possession, custody or

control.  Federal courts have consistently held that documents are deemed to be within the

'possession, custody or control' for purposes of Rule 34 if the party has actual possession,

custody or control, *or has the legal right to obtain the documents on demand.   F.D.I.C. v.*

*Halpern*, 271 F.R.D. 191, 193 (D. Nev. 2010) (quoting Fed. R. Civ. P. 34(a)(1) and 8B Wright,

Miller & Marcus, Federal Practice and Procedure § 2177 (3rd Ed. 2010) (internal quotation

marks omitted) (emphasis added)); *A.H. ex rel. Hohe v. Knowledge Learning Corp.*, 2010 WL

4117508, 9 (D. Kan. 2010) ("Rule 34(a) enables a party seeking discovery to require production

of documents beyond the actual possession of the opposing party if such party has retained any

right or ability to influence the person in whose possession the documents lie.").

---

[12]      The duty to preserve evidence is not limited to preserving the documents themselves. When, as is the case here, the allegations purporting to establish liability hinge on the contents (or lack thereof) of certain files, the duty to preserve necessarily encompasses the duty to preserve the integrity of those files. *Cf.* Fed. R. Civ. P. 26(b) (acknowledging that relevant evidence can include a document's "nature," "condition," or "location").  As discussed above, Plaintiff may have failed to preserve the hardcopy loan files and underwriting materials for the loans at issue in the Amended Complaint, and may not have even retained a complete copy of the documents it provided to the ultimate buyers of the loans.  In addition, Plaintiff has already admitted that it did not maintain the electronic files/foldering system stored in DocStar, which, given the allegations in this case, is itself, destruction of evidence.  Regardless of its duties and responsibilities as a *receiver*, the FDIC had an obligation as a potential *litigant* to ensure against the destruction or significant alteration of evidence, even if doing so comes at an expense. Plaintiff dismantled DocStar and, in doing so, it may have dismantled any ability for Defendants to mount a proper defense.  Defendants thus reserve the right to seek an order of sanctions for spoliation if Plaintiff's failure to preserve evidence prejudices Defendants in any way.

As of August 8, 2012—approximately four months after Defendants served their RFPs, Plaintiff had apparently made no effort whatsoever to collect relevant documents from Citizens Bank.  Plaintiff has indicated that, since the meet-and-confer, it has inquired of Citizens Bank as to whether it has relevant loan files and hard drives of the loan officers responsible for originating and servicing the relevant loans.  Ex. 7, August 9, 2012 e-mail from C. Getto. Whether it has done so or not, this is plainly insufficient to address Defendants' discovery needs. Defendants asked that Plaintiff make all responsive documents available by August 20 (in advance of the deadline for filing the instant Motion).  Plaintiff would not agree to the August 20 deadline, would not commit to providing documents by any date certain, and, as of this filing, has not done so.  *Id.* at August 15, 2012 e-mail from C. Getto.  The immediate effect of this is that it makes it impossible for Defendants to meet the deadlines in the Scheduling Order.[13] Indeed, the delays in receiving responsive documents—primarily the relevant loan files—has seriously hampered Defendants' ability to mount a defense—causing delays in formulating strategy and engaging experts.

In sum, if documents responsive to Defendants' RFPs—all of them—exist at Citizens Bank, Plaintiff *must* provide Defendants a copy.  *Hock Foods, Inc. v. Wm. Blair & Co.*, 2011 WL 884446 8 (D. Kan. 2011) (When responding to document requests, the "Federal Rules require a party to conduct a reasonable search for responsive information."); *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 2009 WL855955, 8 (S.D.N.Y. 2009) ("It should not require reiteration that litigants have an obligation, when discovery is sought from them, to make reasonable efforts to

---

[13]     For example, Defendants' deadline for submitting expert reports currently is September 4, 2012.  Doc. 53.  But Plaintiff has not provided the loan files and underwriting materials from the relevant loans, and has not even indicated when Defendants might receive them.  There is simply no way Defendants can meet this deadline given Plaintiff's untimely disclosure of relevant documents.  *See* Doc. 78 (Joint Motion to Modify the Scheduling Order).

locate responsive documents, including setting up a reasonable procedure to distribute discovery requests to all employees and agents potentially possessing responsive information, and to account for the collection and subsequent production of the information."); *see also* Fed. R. Civ. P. 26(g).   As such, Defendants request an order compelling Plaintiff to produce responsive documents located at Citizens Bank by September 11, 2012.  If any responsive document or <u>file</u> was, but no longer is, in Plaintiff's custody or subject to Plaintiff's control, Plaintiff should be required to state the disposition of the document, including where it is currently located and the identity of the person or entity that has custody or control.

**D. Defendants Are Entitled To Inspect And Copy The Original Loan And Underwriting Files For The Loans At Issue In The Second Amended Complaint**

***1. Plaintiff Failed to Comply With Rule 34(b)(2), Requiring Production of Documents as Kept in the Usual Course of Business***

One of the fundamental issues with Plaintiff's production is that they utterly failed to comply with Rule 34(b)(2).  That rule requires a producing party to produce documents "as they are kept in the usual course of business."  Fed. R. Civ. P. 34(b)(2)(E).  Plaintiff did not comply this mandate with respect to any of the hardcopy documents that were scanned and made available in Relativity, including the purported loan files.[14]

Producing a hardcopy file as it was maintained in the usual course of business requires "the producing party to reproduce those <u>file folders</u> and place <u>the appropriate documents in them</u> so that the production replicates the manner in which they were originally kept."  *See United States v. O'Keefe*, 537 F. Supp. 2d 14, 19 (D.D.C. 2008) (emphasis added).  Thus, if Plaintiff

---

[14]     Under Fed. R. Civ. P. 34(b)(2)(E), the producing party also has the option to "organize and label [documents] to correspond to the categories in the request."  Plaintiff did not adequately do this either.  *See* Exs. 4, July 11, 2012 e-mail from C. Getto purporting to disclose the "loan files" as they existed at closing; *see also* Ex. 6 (showing documents in the purported "loan files" that did not even exist when the Bank was closed).

had produced paper copies of the loan files and underwriting materials, this rule would require *exact copies* of the files, including labeled file folders and a way to identify the entire contents of each file.  But, the document ranges Plaintiff has identified as the "loan files," *see* Ex. 4, July 11, 2012 e-mail from C. Getto, do not contain copies of file folders or file tabs to demonstrate the documents actually comprised a file at all.  Moreover, for borrowers with multiple loans at the Bank, there is no indication that any of the various documents came from a "Master" file or individual loan files, although this is how they were maintained at the Bank.  *S.E.C. v. Kovzan*, 2012 WL 3111729, 9 (D. Kan. 2012) ("'[I]t is clear . . . that simply producing a mass of documents with assurance that they are produced in the same manner as they are kept in the ordinary course of business does not automatically satisfy a producing party's obligations'" under Rule 34(b).  The requesting party must be able to reasonably locate the documents responsive to the specific requests." (quoting *In re Mentor Corp. Obtape Transobturator Sling Prods. Liability Litig.*, 2009 WL 152495, 2 (M. D. Ga. 2009)).

 Similarly, the Bank maintained meticulous binders of Board agendas, minutes, and presentations for the full Board meetings and loan committee meetings, as is evidenced on the inventory the Plaintiff has provided of hardcopy documents.  Ex. 5.  Many of the documents from those binders appear to be in Relativity but there is no way for Defendants to identify, with certainty, what was in each binder.  Thus, Defendants are forced to guess as to what materials were presented to the Board.

Plaintiff may contend that it discharged its discovery obligations by running agreed-upon search terms on the documents it collected from the Bank at closing and producing the responsive documents organized by search term.  This was not the parties' agreement.  As an initial matter, utilization of search terms to search a database for documents is useful, though not

sufficient, only if the database is complete.  Here, Defendants agreed to utilize search terms on the Bank's documents *only* because Plaintiff represented that it had collected and imaged *all* of the hardcopy documents available at the Bank at the time it closed.  Defendants did not learn the truth until August 8, 2012 (and, in fact, Defendants are still waiting to learn the exact scope of documents selected for collection and preservation).  If Defendants had known that Plaintiff was not running search terms on the entire universe of Bank documents in existence, Defendants would not have agreed to the use of search terms at all.

Regardless, Defendants only agreed to the use of search terms on the condition that the use of search terms would not cause Plaintiff to destroy family relationships documents have with one another.  At the parties' planning conference, Defendants specifically expressed the concern that if only one document in a file "hit" on a term, only that document and not the entire file would be produced, even though the entire file was relevant and responsive.  *See* Conrad Decl. ¶¶ 15-16.  Plaintiff assured Defendants that the entire file would be produced under such circumstances.   *Id.*; *see also* Ex. 4, July 20, 2012 e-mail from C. Getto (representing that Relativity is populated with "documents that 'hit' on keywords, *and* their associated attachments and doc packs" (i.e. "the logical boundaries of a document 'container'" (emphasis added)).  Thus, any assertion that producing only those documents that "hit" on search terms and organizing those documents by search term satisfies Plaintiff's discovery obligations is inaccurate.   If Plaintiff fulfilled its duties to preserve evidence and perform the searches as indicated at the time of the planning conference, there would be no question as to the existence and contents of the relevant files.

Finally, Plaintiff cannot avoid its obligation to produce exact replicas of the loan files by scanning them and storing them electronically.  Even if the hardcopy documents did somehow

become subject only to the requirements in Rule 34(b)(2)(E)(ii), such documents must be produced "in a reasonably usable form."  Dumping a million pages on Defendants with no obvious organization other than by search terms  in a case where the Amended Complaint makes specific allegations about the contents of files does not, under any circumstances, meet Plaintiff's obligations of producing documents in a reasonably usable form.

It is likewise no answer that the documents comprising the DocStar loan files are available in Relativity and that Defendants should be able to "reassemble" the files by running search terms.  First, those files may not be as comprehensive as the hardcopy files.  Ex. 10, McCaffree Decl. ¶ 18.   Second, counsel for Defendants should not have to "reassemble" anything.  Rule 11 of the Federal Rules of Civil Procedure requires that there be a factual basis for the assertions in the Complaint.  Presumably then, when Plaintiff made allegations regarding the contents (or lack thereof) of various files, it had a copy of the file from which to draw its allegations.  *Cf. S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. at 410 ("Although a complaint includes some amount of legal theory and strategy, Rule 11 of the Federal Rules of Civil Procedure requires all parties to have 'evidentiary support' for the factual contentions in their pleadings.   Given that requirement, producing the compilations of documents that support the factual allegations of a complaint reveals no more than that already revealed by the filing of the complaint." (footnote omitted)).

Furthermore, searching for terms will not yield an entire copy of a loan file.  *See S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. at 414 (rejecting the SEC's contention that it complied with discovery because the defendant "can search through the ten million pages and find substantially the same documents" because "the inaccuracy of such searches is by now relatively well known" and "[a] page-by-page manual review of ten million pages of records is strikingly expensive in

both monetary and human terms and constitutes 'undue hardship' by any definition"). The loan files contained documents, like photographs, that would not bear a search term at all. Ex. 11, Helvey Decl. ¶¶ 1-2. Such omissions are made more critical due to the fact that Plaintiff alleges that Defendants failed to visit the properties that were collateral for the some of the loans. Amended Compl. ¶¶ 55, 98.

### 2. *Defendants are entitled to Inspect and Copy the Original Files*

Because Plaintiff has failed to produce a copy of any loan or underwriting file, Defendants requested access to the original loan files for inspection and copying, as permitted by Rule 34(a)(1) (allowing a party to request inspection and copying of designated documents). Ex. 4, June 27, 2012 e-mail from A. Harse & July 17, 2012 e-mail from A. Harse. Plaintiff declined, initially stating that Defendants' request is "unduly burdensome." *Id.* at July 11, 2012 e-mail from C. Getto. Plaintiff never explained why allowing <u>Defendants</u> an opportunity to inspect the loan files would result in an undue burden on <u>Plaintiff</u>. Later, Plaintiff claimed that, "[t]o the best of [Plaintiff's] knowledge, the hard copy documents comprising the loan files are in the possession of the purchasers of those loans." *Id.* at July 20, 2012 e-mail from C. Getto. If this is true as a general matter, then it does not explain why Plaintiff cannot provide access to the Lockhaven Estates file(s) since that loan has not yet been sold. Ex. 1 (Plaintiff's Response to Interrogatory 15). In any event, it contradicts Plaintiff's more recent statement at the meet-and-confer that many of these records are now under the supervision of the assuming institution—Citizens Bank—to which Plaintiff continues to have unlimited access and control. To the extent Plaintiff continues to have control over the relevant loan files and underwriting materials, Defendants seek an order compelling Plaintiff to produce them for inspection and copying.

**E. Plaintiff Has Not Yet Supplemented Its Interrogatory Responses And Produced Documents It Agreed To Produce Following The Meet-And-Confer**

Finally, Plaintiff has agreed to update some of its responses to various Interrogatories and RFPs, but has not yet done so.  Interrogatory 10 asked Plaintiff to "[i]dentify and describe any and all procedures or steps taken by the FDIC to <u>collect</u> documents and information (in any form—including electronic) from Columbian bank post-Receivership.  Such description should include [among other things] reference to the method and manner by which such documents were collected."  Ex. 1.  Interrogatory 11 asked Plaintiff to "[i]dentify and describe any and all procedures or steps taken by the FDIC to <u>preserve</u> documents and information (in any form—including electronic) related in any way to the facts or claims in the Lawsuit, including all documents obtained from Columbian bank after its closure."  *Id.*  Now that Defendants know that Plaintiff did not image all hardcopy documents at the Bank, it is clear that Plaintiff's responses to these interrogatories are woefully inadequate.   Through the meet-and-confer process, Plaintiff agreed to supplement its responses to these interrogatories  Ex. 7.

In addition, Plaintiff has agreed to produce copies of litigation hold notices provided to third-parties and a privilege log describing litigation hold notices that it claims are protected from disclosure under the attorney-client privilege or the work-product doctrine in response to RFP 81, produce communications with the buyers of the loans in response to RFP 84, identify by Bates or Relativity ID documents that are responsive to RFPs 26, 27, 28, 30, 76, and 88, and provide documents obtained from Beal Bank in an accessible format in response to RFP 89.  Exs. 2 & 7.  Despite these promises, it has not yet done so.  In addition, Plaintiff has not yet identified the complete loan packages in response to Interrogatory 3.  *See supra* p. 8-9 & 20.  The continued delays are seriously impacting Defendants' ability to mount a defense.   As such,

Defendants seek an order to compel supplemental responses and production no later than September 11, 2012.

## CONCLUSION

For the foregoing reason, Defendants respectfully request that this Court entire an order pursuant to Fed. R. Civ. P. 37(a)(3)(B) compelling Plaintiff by September 11, 2012 to:

(1) Fully respond to all RFPs by producing documents available from Citizens Bank, or if a document or file was, but no longer is, in Plaintiff's custody or subject to Plaintiff's control, state the disposition of the document, including where it is currently located and the identity of the person or entity that has custody or control;

(2) Permit inspection and copying of original loan files and underwriting materials for the loans at issue in the Amended Complaint;

(3) Supplement its responses to Interrogatories 10 and 11 and RFPs  26, 27, 28, 30, 76, and 88, produce documents responsive to RFPs 81, 84, and 89, as agreed to by the parties;

(4) Provide a  log for any responsive documents being withheld on the grounds of privilege; and

award Defendants (1) their costs and fees incurred in reviewing documents in an effort to locate the loan files which were not in the Relativity database as represented by Plaintiff, and (2) their costs and fees in bringing this Motion to Compel, and (3) for such other and further relief as the Court deems just and proper.  *See* Fed. R. Civ. P. 37(a)(5).

.

Respectfully submitted,


/s/ Lyndsey J. Conrad
Michael Thompson                    D. Kan. # 70196
Angela Harse                              KS # 21485
Lyndsey J. Conrad                       KS # 23527
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO  64112
Tel:  816-983-8000
Fax:  816-983-8080
michael.thompson@huschblackwell.com
lyndsey.conrad@huschblackwell.com

*Attorneys for Carl and Sam McCaffree*


## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2012, a copy of the foregoing was filed electronically with the above captioned court, with notice of case activity to be generated and sent electronically by the Court's CM/ECF system to all counsel of record.

/s/ Lyndsey J. Conrad